## Cline Will.

Argued March 19, 1969. Before BELL, C. J., JONES, COHEN, EAGEN, O'BRIEN, ROBERTS and POMEROY, JJ.

544

*A. C. Scales,* with him *Scales and Shaw,* for appellant.

*Ned J. Nakles,* with him *Emmett C. Boyle, Jr.,* and *Boyle, Nakles and Reeves,* for appellee.

OPINION BY MR. JUSTICE JONES, April 23, 1969:

This is an appeal from a decree of the Orphans' Court of Westmoreland County upholding the validity of a will which was challenged on the ground that it was forged.

Lloyd A. Cline (decedent), a Westmoreland County resident, died on January 15, 1966 at the age of 72 years, survived by two daughters, Rachel Kuhn (the proponent of the will) and Lillian Hudak (the contestant of the will).

On September 7, 1966, the proponent offered for probate as decedent's last will a writing dated January 16, 1963, which, with the exception of the signatures thereon, was admittedly written by the proponent. Decedent's signature and that of the one subscribing witness, Blanche Cline, were attacked as forgeries. A caveat to the probate of this writing was filed by the contestant with the Register of Wills and, after a hearing, the Register of Wills refused probate of the writing on the ground that it was a forgery. The proponent appealed this decree to the Orphans' Court of Westmoreland County and, after a *de novo* hearing, that court held that the writing was not forged and directed the

Register of Wills to admit the writing to probate as decedent's last will. From that decree the instant appeal was taken.

The challenged will reads as follows:

"Jan. 16, 1963.

I, Lloyd A. Cline, do bequeath to my daughter, Rachel Louise Cline Kuhn all real estate remaining in my name at the time of my death.

Signed<br>Lloyd A. Cline

Witness:
*Blanche Cline*"

In 1965, decedent had had a lawyer-prepared will which was destroyed in a fire. Approximately six weeks after decedent's death, the proponent took the writing of January 16, 1963 to an attorney. Allegedly, this writing had been in a safe deposit box in a bank, and proponent stated she had forgotten about this writing at the time of decedent's death because her first concern at that time was her aunt, Blanche Cline— the sole subscribing witness—who was very ill and who subsequently died July 17, 1966.

On January 16, 1963—the date of the alleged will— decedent was living with his two unmarried sisters, Blanche Cline and Helen Cline. These three frequently visited the proponent. The proponent testified that the writing was prepared and executed in her dining room during such a visit on January 16, 1963. Present at that time and place were decedent, his two sisters and the proponent. The decedent's other two sisters and the proponent's husband and children were in another room at the time. According to the proponent, the conversation which led up to the preparation and execution of the will was inaugurated by Blanche Cline. The decedent allegedly stated that he was planning to give the home to his daughter, the contestant,

and what was left he would give to the proponent.[1] The decedent requested the proponent to write a will and told her what he wanted; she wrote the will in her own language. At that time decedent was seated at the head of the table, proponent to his right, Helen Cline to his left and Blanche Cline between decedent and proponent. While all these persons, according to the proponent, saw decedent sign the instrument, only Blanche Cline witnessed it.

In support of her case, the proponent called Helen Cline, who corroborated in large part proponent's testimony and further stated that she told decedent "write as good as you can," that she saw the proponent write the will, the decedent sign it and Blanche Cline subscribe as a witness. Emmet C. Boyle, Jr., a member of the Westmoreland County bar, stated that the decedent had told him that he wanted to give the house to the contestant and the rest of his realty to the proponent and that the contestant did receive the house.

The contestant produced the following evidence: (a) her own testimony that the signature on the writing was not that of the decedent; (b) the testimony of John Lindsay, a vice-president of the First National Bank of Westmoreland, who stated that he had observed the decedent's signature for many years and that in his opinion the signature on the writing was not that of the decedent; (c) the testimony of H. N. Wollam, an attorney, who had seen the decedent's name on other occasions and stated that the signature on the writing was not the decedent's signature and that, in his opinion, the name of Blanche Cline, the subscribing witness, was not genuine; (d) the testimony of M. A. Nernberg, an admittedly qualified hand-

---

[1] The contestant had lived in Florida for about ten years and was planning to return to Pennsylvania. The contestant did receive the home during decedent's lifetime.

writing expert, who stated that the writing was a forgery mainly because the signature was written smoothly and the decedent was a person who could not sign his name in that fashion.

Certain well-settled principles in this area of the law must be kept in mind in resolving this appeal: (a) the findings of fact by the chancellor, approved by a court en banc, have the weight and effect of a jury verdict and must be accepted at the appellate level unless such findings lack evidentiary support or unless the chancellor has capriciously disbelieved evidence or abused his discretion or committed an error of law. See: *Elias Will*, 429 Pa. 314, 317, 239 A. 2d 393 (1968); *Zeedick Will*, 421 Pa. 44, 46, 218 A. 2d 755 (1966); *Kadilak Will*, 405 Pa. 238, 244, 174 A. 2d 870 (1961); (b) one who relies upon forgery to challenge the validity of a will has the burden of proving such forgery in a clear, direct, precise and convincing manner. See: *Elias Will*, supra, at 321; *Kadilak Will*, supra, at 243; (c) the opinion evidence of experts in cases of forgery is of little weight and cannot prevail against "positive evidence of actual facts by witnesses whom the Chancellor considers credible": *Elias Will*, supra, at 321; *Pochron Will*, 367 Pa. 306, 310, 311, 80 A. 2d 794 (1951); (d) the testimony of handwriting experts that a will offered for probate is a forgery corroborated by probative facts and circumstances may be sufficient to overcome the testimony of those claiming to be subscribing witnesses to the questioned document and to support a finding of forgery and the corroborative evidence may be the most nearly positive and direct evidence which the nature of the case will admit. See: *Snedeker Estate*, 368 Pa. 607, 609, 610, 84 A. 2d 568 (1951); *Young Estate*, 347 Pa. 457, 459, 32 A. 2d 901 (1943); *Henry's Estate*, 276 Pa. 511, 513, 120 A. 454 (1923). Cf. *Masciantonio Will*, 392 Pa. 362, 382, 383, 141 A. 2d 362 (1958).

The chancellor, after having heard and observed the witnesses, found that: "In view of the clear factual evidence presented by [the proponent] and Helen Cline and the fact that the decedent stated to [Attorney Boyle] . . . and to Helen Cline . . . his wishes as to disposition of his property as contained in the will, there are no suspicious circumstances in this matter" and concluded that it "must hold that the paper of January 16, 1963 is not a forgery and is a proper will."

Our reading of this record reveals that there is testimonial support for the chancellor's findings and that the chancellor did not capriciously disbelieve the testimony, abuse his discretion, or commit an error of law. Under the restrictive scope of our appellate review we have no alternative other than to sustain the instant decree.

We fully recognize and reaffirm the teaching of *Young Estate*, 347 Pa. 457, 459, 460, 32 A. 2d 901 (1943), upon which the contestant places such great reliance. Our review of the record does not indicate that the court below disregarded that which we said in *Young Estate*. As we read the opinion of the court below the expert opinion evidence was weakened by the manner in which the expert reached his finding that the will was a forgery[2] and, despite facts and circum-

---

[2] In discounting the effect of the expert testimony, the chancellor commented, "The disputed document was admitted in evidence as Proponent's Exhibit '1' and the contestants had admitted in evidence ten signatures of the decedent as standards to be compared to Exhibit '1'. The expert had no knowledge of how the standard signatures were made. He had no knowledge of whether the disputed document was signed while the writer was seated, standing or on what surface the document rested when signed. The standards differed so greatly among them alone, that it was almost impossible to determine what was the usual manner of signing the decedent's name.

stances which tend to corroborate the expert's ultimate conclusion, the direct and factual evidence of the proponent overcame the opinion of the expert plus the circumstances corroborative of that opinion. It was within the province of the chancellor to so find. At the appellate level, under the posture of the case at bar, even if we were inclined to disagree with the chancellor, we cannot do otherwise than to sustain the decree.

Decree affirmed. Contestant pay costs.

---

"Contestant's Exhibit 'C' . . . is almost a carbon copy of the signature on the Will, allowing for some tremors due to the age of the decedent. It shows that the decedent could sign his name plainly and smoothly when he tried. . . ."