### LINCOLN BANK
v.
### NATIONAL LIFE INSURANCE CO. et al.

#### Civ. A. No. 76–2171.

United States District Court, E. D. Pennsylvania.

May 30, 1979.

---

Donald F. D'Agui, Philadelphia, Pa., for Lincoln Bank.

Arthur H. Rainey, Philadelphia, Pa., for Nat. Life Ins.

Jerold S. Berschler, Norristown, Pa., for Jules Demchick.

## FINDINGS OF FACT AND CONCLUSION OF LAW

NEWCOMER, District Judge.

### FINDINGS OF FACT

1. The plaintiff, Lincoln Bank (Lincoln) is a Pennsylvania corporation with its principal place of business in Philadelphia, Pennsylvania.

2. National Life Insurance Company (National Life) is a mutual insurance company organized under the laws of Vermont with its principal place of business in Montpelier, Vermont. National Life is authorized to do business in Pennsylvania.

3. Third-party defendant, Jules Demchick (Demchick), is an individual, and a citizen of the State of Florida.

4. Jurisdiction is based on diversity of citizenship, 28 U.S.C. § 1332(a).

5. On December 3, 1971, National Life issued a life insurance policy to Demchick in the face amount of $750,000.

6. Demchick assigned the policy to Lincoln on January 24, 1972, as security on a loan in an amount in excess of $35,685. The loan was never repaid by Demchick and is currently due and owing. National Life acknowledged the assignment a short time thereafter.

7. The events leading to this suit began in January, 1974, when National Life agreed to extend a loan to Demchick, provided that the cash surrender value of Demchick's policy be pledged as collateral for the loan.

8. A form document entitled "Policy Loan Agreement", which was ordinarily used by National Life to effect such policy loans, was prepared on January 16, 1974.

9. The Policy Loan Agreement specified:

(a) The amount of the policy loan was to be $32,547.16.

(b) The sole security for the loan was to be the cash surrender value of the Demchick policy.

(c) The loan was to be paid to Demchick.

(d) The policy and "all money due or to become due thereunder, and every right, title and interest in and to the same is hereby assigned to National Life" as security for the loan.

(e) The assignment was to constitute a first lien on the policy.

10. The Policy Loan Agreement bears the signature of both Doris Durnin, on behalf of Lincoln Bank, and that of Jules Demchick.

11. The signature of Jules Demchick on the Policy Loan Agreement is authentic.

12. Ms. Durnin was the assistant manager of the Bala 1 Branch Office of Lincoln Bank through which the Policy Loan Agreement was processed.

13. Ms. Durnin had apparent authority to release the collateral in issue, although she was not expressly authorized by the bank's Board of Directors to do so.

14. In reliance on the Policy Loan Agreement, National Life granted a loan to Demchick in the amount of $32,547.16, and mailed a check in that amount to him at his then current address.

15. Demchick received the check and deposited it in an account of National Administrative Services of Florida, Inc. (NASF).

16. The premium for Demchick's policy due on December 3, 1974, was not paid, and the policy lapsed.

17. National Life, in accordance with the terms of the policy, applied the cash surrender value of $34,500, first to repay indebtedness to National Life, and then to purchase extended term insurance on the life of Jules Demchick, which insurance expired in July, 1975.

18. Lincoln did not receive any information from National Life regarding the status of the Demchick policy in March of 1975, nor did Lincoln rely on any such status report to its detriment. No status request was made as claimed during March of 1975, and telephone records do not support the contention that such a request was made.

19. A status request was made in December of 1975, and National Life supplied Lincoln with correct information at that time regarding the status of the policy.

CONCLUSIONS OF LAW

The dispute between Lincoln Bank and National Life is one of competing claims to the cash surrender value of Demchick's insurance policy. National Life claims that it is entitled to the fund and that it was warranted, according to the terms of the policy, in applying the cash surrender value of the policy at the time of lapse to repay an outstanding policy loan. National Life further argues that the terms of the Policy Loan Agreement specifically subordinated any claim which Lincoln might have on the policy to the first lien of National Life.

Lincoln advances three theories in support of its claim that it is not bound by the subordination clause in the Policy Loan Agreement. First, it contends that Doris I. Durnin was not authorized to sign the Policy Loan Agreement on behalf of Lincoln. Second, it contends that the signature of Jules Demchick on the Agreement was not genuine and that the Agreement is, therefore, a "nullity". Finally, Lincoln alleges that in March, 1975, National Life, in response to an inquiry from Lincoln, advised Lincoln that there were then no loans outstanding against the policy. As a result, Lincoln allegedly detrimentally relied on the communication from National Life and released $46,350. of escrow funds which it believed would be secured by a superior lien on the proceeds on the Demchick policy.

The first question to be addressed is whether Ms. Durnin's signature on the Policy Loan Agreement bound Lincoln Bank, thereby releasing the lien which Lincoln held on the Demchick policy.

An agent's power to bind his principal can arise from four different sources. The first, express authority, is that authority which is directly granted to the agent by the principal. The second, implied authority, is a derivative of the first. It authorizes the agent to do all that is proper, usual, and necessary to the exercise of that authority which has already been expressly granted.

The existence of the latter is dependent on the existence of the former. *Reifsnyder v. Dougherty*, 301 Pa. 328, 333, 152 A. 98 (1930). The third source of an agent's power is apparent authority, and the fourth is "inherent agency power". These final two sources will be discussed at greater length *infra.*

National Life offered testimony to show that Ms. Durnin was an "Authorized Signer", specifically authorized by the Board of Directors of Lincoln Bank to execute certain documents on behalf of the bank. Lincoln countered with evidence that showed that the authority to release collateral is only granted upon a formal memorandum advice from the Board of Directors, signed by the Board or signed by the Secretary of the Board. Because Lincoln's evidence is credible, the Court must conclude that Ms. Durnin lacked express authority to release collateral on behalf of Lincoln Bank, since no evidence of the existence of such a Board memorandum was introduced. The Court must reach the same conclusion on the issue of the existence of implied authority, since its existence is dependent upon there being express authority to support it.

The third source of an agent's power to bind his principal is apparent authority:

> "Apparent authority is the power to affect the legal relations of another person by transactions with third persons, professedly as agent for the other, arising from and in accordance with the other's manifestations to such third persons."

Restatement (Second) of Agency, § 8.

Unlike express or implied authority, which arise as a result of communications between the principal and the agent, apparent authority requires a manifestation by the principal to the third party of the agent's authority. Restatement (Second) Agency, § 8, comment (a) (1958).

Section 27 of the same Restatement describes the forms by which such a manifestation by a principal to a third party can create apparent authority:

> "[A]pparent authority to do an act is created as to a third person by written or spoken words or any other conduct of the principal which, reasonably interpreted, causes the third person to believe that the principal consents to have the act done on his behalf by the person purporting to act for him."

Pennsylvania has expressly adopted both Section 8 and Section 27 of the Restatement (Second) Agency (1958). *Revere Press, Inc. v. Blumberg*, 431 Pa. 370, 375, 246 A.2d 407 (1968); *Zager v. Gubernick*, 205 Pa.Super. 168, 172, 208 A.2d 45 (1965).

National Life introduced evidence to show that Ms. Durnin signed several other Policy Loan Agreements on behalf of Lincoln, both before and after the one at issue; that these Policy Loan Agreements were submitted to National Life; and that upon receipt of them National Life disbursed money to Lincoln which Lincoln kept without question. National Life argues that a third party such as National Life could reasonably have inferred from these prior dealings that Lincoln had consented to Ms. Durnin's authority.

Pennsylvania has adopted a two-pronged test for determining whether a reasonable inference of consent may be drawn from prior dealings between the principal and the third party. The prior dealings must have (1) "a measure of similarity to the act for which the principal is sought to be bound, and, granting this similarity, (2) a degree of repetitiveness". *Jennings v. Pittsburgh Mercantile Co.*, 414 Pa. 641, 645, 202 A.2d 51, 54 (1964). See also, *Brientnall v. Peters*, 317 Pa. 356, 176 A. 240 (1935); *Colonial Trust Company v. Davis*, 274 Pa. 363, 118 A. 312 (1922).

Lincoln argues that the "measure of similarity" between the Demchick Policy Loan Agreement and all others executed by Ms. Durnin is insufficient to support a finding of apparent authority in two respects. First, Lincoln suggests that since all the prior Policy Loan Agreement proceeds were paid directly to Lincoln instead of to the policy holder as in the transaction at issue, National Life should have been on notice that Ms. Durnin had exceeded her authority. The Court cannot agree.

Mr. Richard Bergey described the purpose of the Policy Loan Agreement arrangement between Lincoln and National Life:

"The procedure was that when a client was sold a policy he was able to borrow a portion of the first year's premium. In some cases it was a multi-year premium. He might pay two or three years at a time. At the point where that premium had been exhausted the cash surrender value had been built in the policy to the point where the loan from the bank was able to be paid off by a policy loan . . and that loan was made with documentation such as this [Policy Loan Agreement]."

N.T. 2–92.

Under such an arrangement, National Life might reasonably have assumed that Lincoln had made other arrangements to protect itself, perhaps by having arranged for Demchick to provide an alternate form of collateral to secure the loan. The loan from Lincoln to Demchick that was secured by the policy was issued on November 21, 1973, at an interest rate of 14%. The policy loan made to Demchick less than two months later was to be repaid at a 6% rate. The Court takes judicial notice that it is unlikely that Demchick would have been able to obtain a commercial loan at a 6% rate in January, 1974. It would have been reasonable for National Life to have assumed that Demchick needed a loan for some reason, and that he offered Lincoln substitute collateral so that the 6% loan funds in the policy would be freed for his use. Moreover, National Life knew that Lincoln had effective control over the details of any such transaction. Under the circumstances, the Court concludes that no standard of commercial reasonableness compelled National Life to investigate whether Lincoln had protected itself.

Lincoln also argues that the amounts of the prior Policy Loan Agreements were materially smaller than the Demchick Policy Loan, and that National Life should therefore have been on notice of Ms. Durnin's lack of authority. The Court likewise disagrees with that contention. The defendant introduced into evidence ten other Policy Loan Agreements, $9016 being the highest face amount of such a loan, while the amount of the Demchick Policy Loan was $32,547. In light of the facts and of the commercial setting, the Court concludes that the amounts were reasonably similar. Given Ms. Durnin's authority over amounts as large as $9016, National Life would have been justified in assuming that her authority extended to a figure as high as $32,547.

Turning to the second prong of the test, the evidence supports the conclusion that there existed a degree of repetitiveness in the prior dealings between National Life and Ms. Durnin. National Life introduced documentary evidence to show that Ms. Durnin had personally co-signed at least three National Life Policy Loan Agreements before the one in issue. Under the facts and circumstances of this case, those three prior dealings were sufficient to establish a degree of repetitiveness.

Because there was a sufficient measure of similarity and a degree of repetitiveness between the prior dealings and the transaction for which the principal is sought to be bound, the Court concludes that Ms. Durnin possessed apparent authority to release the lien upon the Demchick policy to National Life.

Finally, the decision in this case is in accord with the policy judgment expressed by the Pennsylvania courts in adopting the doctrine of "inherent agency authority". *Rednor and Kline, Inc. v. Department of Highways*, 413 Pa. 119, 125, 196 A.2d 355 (1964). That doctrine is best expressed in Section 161 of the Restatement (Second) of Agency (1958):

"Unauthorized Acts of General Agent A general agent for a disclosed or partially disclosed principal subjects his principal to liability for acts done on his account which usually accompany or are incidental to transactions which the agent is authorized to conduct if, although they are forbidden by the principal the *other party reasonably believes that the agent is authorized to do them and has no notice that he is not so authorized.* (emphasis added)"

The Court believes that, were the issue squarely before it, the Supreme Court of Pennsylvania would expressly adopt section 161. See *Ebasco Services, Inc. v. Pennsylvania Power and Light Co.*, 402 F.Supp. 421, 446, n. 41 (E.D.Pa.1975), and cases cited.

The policy behind Section 161 is to insure an equitable result in situations where traditional concepts of agency law might fail to do so. At the heart of the section is a policy judgment which is astutely expressed in Comment a to § 161:

> "Liability is based primarily upon the theory that, if one appoints an agent to conduct a series of transactions over a period of time, it is fair that he should bear losses which are incurred when such an agent although without authority to do so, does something which is usually done in connection with the transactions he is employed to conduct. . . . The basis of the extended liability stated in this Section is comparable to the liability of a master for the torts of his servant. See Comment a on § 219. In the case of the master, it is thought fair that one who benefits from the enterprise and has a right to control the physical activities of those who make the enterprise profitable, should pay for the physical harm resulting from the errors and derelictions of the servants while doing the kind of thing which makes the enterprise successful. The rules imposing liability upon the principal for some of the contracts and conveyances of a general agent, whether or not a servant, which he is neither authorized nor apparently authorized to make, are based upon a similar public policy. Commercial convenience requires that the principal should not escape liability where there have been deviations from the usually granted authority by persons who are such essential parts of his business enterprise. In the long run it is of advantage to business, and hence to employers as a class, that third persons should not be required to scrutinize too carefully the mandates of permanent or semipermanent agents who do no more than what is usually done by agents in similar positions."

Applying Section 161 to the facts of this case, the Court concludes that National Life's belief in Ms. Durnin's authority was reasonable, and that no standard of reasonable commercial conduct would have put National Life on notice of any defect in her authority. Where both the principal and the third party are equally innocent, Section 161 will place the burden upon the principal, since he is in the better position to supervise the agent's actions.

Furthermore, in this case it is entirely equitable to place the loss upon Lincoln, since the record is replete with instances of poor supervision and monitoring of dealings with third parties. There was no adequate manual describing the duties of managers and assistant managers. Ms. Durnin testified that often she would sign any of the green documents (Policy Loan Agreements) which were placed "under her nose". Nor was there any regular procedure consistently followed by the Bala 1 Branch to make certain that Lincoln's interests were protected before releasing collateral. A principal who fails to exercise the care required to supervise its employees should bear the loss when errors result.

■ Lincoln's second major argument is that, even if Ms. Durnin's signature on the Policy Loan Agreement is sufficient to bind the bank on an agency theory, Lincoln is nevertheless not bound by the release of the lien granted in the Agreement because Demchick's signature was a forgery. Lincoln contends that if the signature is found to have been a forgery, the Policy Loan Agreement is a "nullity" as between Lincoln Bank and National Life. The Court need not reach the question of the legal effect of a forgery in these circumstances, because based upon the evidence presented, the Court concludes that Demchick's signature was not a forgery.

National Life offered the testimony of Ms. Judith Morton, the former general office manager and corporate secretary of National Administrative Services of Florida, Inc. (NASF), who had worked under the direct supervision of Demchick during a

two year period covering the transactions in issue. Ms. Morton testified that Demchick was aware of all activities conducted by the NASD office and that he made "practically every decision regarding employees, financing, office space, etc.". Ms. Morton did not recall having seen a particular document requesting the policy loan at issue, but she said that Demchick had made applications to National Life for such loans on his life insurance policy. National Life established that, after processing the loan agreements, it sent a check payable to Jules Demchick in the amount of $32,547.16 to Demchick at his then current address in Florida. Significantly, Ms. Morton, after studying certain entries in the NASF accounting records, which she had made during the course of her duties, testified that Demchick had given her a check, payable to him, for the same amount (i. e. $32,547.16), and that Demchick had instructed her to deposit it into a NASD bank account. Finally, she testified that he directed which account was to be credited on the NASD books. The check itself was introduced into evidence and clearly bears a rubber stamped endorsement of NASF "FOR DEPOSIT ONLY", and a signature reading "Jules Demchick" (which Lincoln also contends is a forgery). Ms. Morton also testified that the signature on the Policy Loan Agreement bore close resemblance to that of her supervisor, Demchick. When considered in the aggregate, the evidence strongly supports the conclusion that Demchick both signed the Policy Loan Agreement and endorsed the loan check received by NASF from National Life.

Against the strong evidence offered by National Life in support of the authenticity of the signatures, Lincoln Bank and Demchick offered both the testimony of a handwriting analyst and Demchick's self-serving denial of the authenticity of the signatures.

The handwriting analyst, after examining the signatures on both the Policy Loan Agreement and the check, concluded that they were not authentic. While such expert testimony must be considered carefully by the trier of fact, it is clear that the Pennsylvania courts refuse to accept such evidence as conclusive, or even highly probative:

> "[T]he opinion evidence of an expert is, in cases of forgery, entitled to very little weight and cannot prevail against positive evidence of actual facts by witnesses whom the Chancellor considered credible". *Elias Will*, 429 Pa. 314, 321, 239 A.2d 393, 396 (1968); *Cline Will*, 433 Pa. 543, 547, 252 A.2d 657 (1968).

In view of the strong evidence offered by the defendant tending to show actual receipt by Demchick of the loan check, and its subsequent deposit in a NASF account over which Demchick had control, the logical inference is that Demchick signed the Policy Loan Agreement. The Court accepts the policy expressed by the Pennsylvania courts with respect to handwriting analysis and holds that the expert's testimony cannot prevail over the positive and credible testimony of Mrs. Morton.

Finally, the Court does not consider Demchick's self-serving denial entitled to much credit. In 1976, Demchick was convicted of the crimes of conspiracy to defraud National Life, participating in a scheme to obtain property from National Life by fraud, obtaining money from National Life through false pretenses, and interstate transportation of money stolen from National Life. Those crimes were committed during the same time period involved in this lawsuit. If Demchick's testimony were believed, he would almost certainly be entitled to recover $32,547.16 from National Life, a prospect which provides unmistakable incentive for Mr. Demchick to claim forgery. Under the circumstances, Demchick's testimony is entitled to virtually no weight.

The Court therefore need not reach Lincoln's argument that the Policy Loan Agreement is a "nullity".

█ Lincoln's final argument in support of recovery is that National Life is estopped from asserting its lien because National Life gave Lincoln inaccurate information as to the status of the Demchick policy in March of 1975. Lincoln claims that it detrimentally relied on that misinformation and

released $46,350 of escrow funds which it held to secure repayment of various loans to National Administrative Services.

Lincoln contends that at the direction of its Senior Vice President, a Lincoln Loan Teller was instructed to and did make a telephone call to the office of National Life in Montpelier, Vermont, during March, 1975, requesting information on the status of the Demchick policy. Lincoln claims that it was in response to this request that National Life supplied the alleged misinformation, specifically, a statement to the effect that no other liens were held on the policy.

The telephone records of Lincoln Bank indicate that only one telephone call was placed by Lincoln to the offices of National Life in Montpelier, Vermont, during March of 1975. The former General Counsel of Lincoln testified that he regularly maintained a telephone log in which he recorded, by date, all telephone calls he made during the course of his duties at the bank. The log indicates that it was he and not the Head Loan Teller who made the only March call. The log shows that he called general counsel of National Life in Montpelier.

Since no status request was in fact made, the Court concludes that no misinformation was supplied to Lincoln by National Life. No action in estoppel is supportable.

National Life is exonerated from any liability either to Lincoln Bank or to Demchick. Demchick's claim against National Life is based on National Life's alleged payment of the policy loan on a forged Policy Loan Agreement. That claim, of course, must fail because Demchick in fact signed the Agreement and received the proceeds thereof.

Finally, Lincoln Bank is entitled to judgment on its direct claim against Demchick in the amount of $35,685 plus 14% interest thereon from November 20, 1973. The rate of interest was fixed by the loan contract and "is a substantive part of the debt as much as the principal is" *Roos v. Fairy Silk Mills*, 342 Pa. 81, 83, 19 A.2d 137, 138 (1941), quoting *Hummel v. Brown*, 24 Pa. 310 (1855). Since none of the principal or any interest thereon has ever been repaid, Lincoln Bank is entitled to judgment against Demchick in the amount of $63,265.11, an amount equal to $35,685 plus 14% interest calculated to the date of this decision.