993 A.2d 270

COMMONWEALTH of Pennsylvania/DEPARTMENT
OF PUBLIC WELFARE

v.

WORKERS' COMPENSATION APPEAL BOARD (HARVEY).

Appeal of Larry Harvey.

Supreme Court of Pennsylvania.

Argued Oct. 20, 2009.

Decided April 29, 2010.

Marla A. Joseph, Jenkintown, Daniel Joel Siegel, Havertown, for Larry Harvey.

Lawrence R. Chaban, for Amicus Curiae Pennsylvania Association for Justice.

Andrew Edson Greenberg, Chartwell Law Offices, LLP, Norristown, for Amicus Curiae School Districts Insurance Consortium.

John Brendan O'Brien, O'Brien, Rulis & Bochicchio, L.L.C., Pittsburgh, for Department of Public Welfare.

Amber Marie Kenger, Richard C. Lengler, PA Department of Labor & Industry, for Worker's Compensation Appeal Board.

Charles K. Serine, PA Public School Employees' Retirement System, for Amicus Curiae Public School Retirement Board.

Darryl R. Slimak, McQuaide Blasko Law Offices, State College, for Amicus Curiae The Pennsylvania State University.

CASTILLE, C.J., SAYLOR, EAKIN, BAER, TODD, McCAFFERY, GREENSPAN, JJ.

## *OPINION*

Justice SAYLOR.

Appellant, Larry Harvey, challenges the method of calculating a statutory credit, against workers' compensation, for employer-funded pension benefits.

Since 2001, Mr. Harvey ("Claimant") has received workers' compensation benefits due to a work-related injury suffered while in the employ of the Commonwealth of Pennsylvania, Department of Public Welfare ("Employer"). In 2002, he also began receiving disability retirement benefits administered through the State Employees' Retirement System ("SERS").

Under Section 204(a) of the Workers' Compensation Act,[1] benefits afforded under that Act are subject to being offset by retirement benefits, as follows: "[B]enefits from a pension plan to the extent funded by the employer directly liable for the payment of compensation which are received by an employe shall ... be credited against the amount of the [workers' compensation] award[.]" 77 P.S. § 71(a); *accord* 34 Pa.Code § 123.8(a). In 2005, Employer invoked Section 204(a) and implemented an offset in the amount of $359 per week, as the employer-funded share of Claimant's disability retirement benefits.[2] The calculations resulting in the credit were accomplished by the State Employees' Retirement System ("SERS"). The net effect was to reduce Claimant's weekly $440 workers' compensation benefit payment to $81.

Petitioner filed a review petition challenging the offset. At the center of the parties' dispute is an actuarial assumption utilized in SERS's calculation.

As background, pursuant to the Retirement Code, 71 Pa. C.S. §§ 5101–5956, SERS administers a defined-benefit retirement plan for Commonwealth employees and certain others. Under the plan, benefits are a function of years of service multiplied by a final average salary, discounted according to

---

1.  Act of June 2, 1915, P.L. 736 (as amended, 77 P.S. 1–1041.1; 2501–2626) (the "WCA" or the "Act").

2.  Such credit was applied retrospectively and prospectively.

defined annual accrual and class-of-service factors. *See* 71 Pa.C.S. §§ 5102 (definition of standard single life annuity), 5702 (definition of maximum single life annuity). Complexities arise because the amount (and present value) of any particular employee pension is not determined finally until retirement. *See* 71 Pa.C.S. §§ 5102, 5702. Even then, the expense to the system (and, correspondingly, employers) in funding ongoing installments is open-ended, since cost is dependent on variables such as the pensioner's longevity and future investment performance. Nevertheless, benefits are fixed, payable indefinitely into the future, and not directly related to the amount of specific employee contributions. *See* 71 Pa.C.S. §§ 5102, 5702

In light of the multiple variables, SERS employs an actuarial assumption of an 8.5 percent investment return as a central factor in assessing the system's ongoing performance and calculating the amount of the periodic employer contributions necessary to maintain its viability. *See* HAYGROUP, SIXTEENTH INVESTIGATION OF ACTUARIAL EXPERIENCE OF THE STATE EMPLOYEES' RETIREMENT SYSTEM OF THE COMMONWEALTH OF PENNSYLVANIA, at 8–9 (March 15, 2006) ("[T]he analysis and investment projection support the continuation of an investment return assumption of 8.5 percent."). Since the pension system itself incorporates essential actuarial assumptions in determining ongoing employer funding, SERS has taken the position that it is reasonable and necessary, for purposes of Section 204(a), to rely on such assumptions in calculating the employer-funded component attributable to individual pensions.

To determine the offset amount, with the advice of an actuarial firm, SERS designed the following formula. First, it selects a maximum single life annuity figure, or the amount payable to the claimant each month, using the statutory formula referenced above (resulting, here, in a monthly payment of $1,888.97). The present value of the account is then calculated by annualizing this figure and multiplying it by an actuarially determined factor representing life expectancy (in this case, 9.47370, yielding $214,746). Actual employee contributions are then aggregated (to $15,071 in this case). Then, an 8.5 percent assumed annual rate of interest—the same figure

utilized in the actuarial evaluations of the overall system and in determining employer contributions—is added (resulting, here, in a value of $27,741 being assigned to the employee-funded portion).[3] The sum is subtracted from the total present value of the pension, yielding the present value allocated to its employer-funded component ($187,005, in Claimant's case), which is converted to an annual figure by dividing by the life expectancy factor (resulting in a figure of $19,739, and yielding a weekly offset of $380).[4] SERS implements the formula to perform calculations in each specific case by reference to a spreadsheet developed by its actuary consultant.

Claimant premised his objection to this calculation on his view that Section 204(a) does not permit the use of assumptions in determining employer funding, but rather, requires an identification of actual dollars contributed by Employer toward his individual pension and specific associated returns. To the extent it is not possible to quantify these, Claimant took the position that Employer is simply without a remedy.

In addressing Claimant's challenge before a workers' compensation judge (the "WCJ"), Employer presented testimony from SERS's director of its benefits determination division, who discussed the above methodology used in calculating Section 204(a) offsets and its specific application to Claimant. Employer also presented the testimony of a consulting actuary specializing in employee benefits with an emphasis on retirement programs. The consultant explained that SERS derives the actuarial assumptions necessary to value the assets and liabilities it administers through annual actuarial valuations and five-year studies in which he and his firm are involved. The consultant recognized that the pension system benefitted

3. The evidence presented in this case does not address the specific treatment of nuances associated with compounding and incremental accrual of contributions, and the present challenge is not directed to such factors. Given that the interest accruals are greater than a simple rate of interest without compounding, presumably some accounting is given to such factors.

4. This amount varies modestly from the initial credit implemented by Employer, since calculation errors were discovered during the process of the litigation.

from many years of exceptional investment performance. On the other hand, he also identified years reflecting negative returns, emphasizing that, in a defined-benefit plan, the risk of loss is allocated to the employer and losses must be addressed on an ongoing basis, as pension payments are distributed, through increased employer contributions. The consultant also explained that there is no method of accurately predicting future returns and liabilities; therefore, reasoned assumptions are necessary elements of the valuation process. Further, specific to the assumed 8.5 percent annual rate of return, he indicated that the figure is derived from past experience viewed with a degree of conservatism, and is subject to periodic reevaluation, *inter alia,* via the five-year investigations.

According to the consultant, the same assumption is reasonable and appropriate for use in Section 204(a) offset calculations. The primary reasons he identified for the use of assumptions in determining the employer-funded component of pension payments related to the nature of defined-benefit plans; concomitant fluctuations in employer funding as compared to the fixed interests of employees; and the inability to trace specific employee or employer contributions or their associated returns to pension benefits. *See* 71 Pa.C.S. § 5508; 34 Pa.Code § 123.2. For example, the consultant indicated:

> In the case of defined benefit pension plan design employer funding . . . [is] handled in an aggregate manner without any separation of the dollars of the required employer contribution into accounts or attribution of those amounts to specific individuals.

> So in the case of these calculations for SERS participants a different approach is required. . . .

> \*      \*      \*

> [T]he information that would be needed to [match contributions to funding] is just plain unavailable and attempts to attribute some part of the employer contribution to any

particular individual employee would give rise to invalid offset calculation results.

*　　*　　*

[U]se of actual investment returns … would inappropriately either overstate or understate depending on the specific investment returns that might be taken into consideration.

Deposition of Brent Mowery, FSA, EA, at 56, 58, 61 (June 1, 2006). The consultant asserted that use of the assumed rate of interest, which otherwise is employed in SERS administration, eliminates fluctuation inherent in the plan and best assures that "the Workers' Compensation offset calculation result does not unfairly favor either the employer or the employee[.]" *Id.* at 129.

Claimant presented no evidence in support of his review petition or in opposition to Employer's presentation.

The WCJ denied Claimant's petition for review and upheld the pension offset, crediting the unrefuted testimony of Employer's witnesses and finding it particularly significant that Claimant presented no contrary expert evidence in rebuttal. The WCJ also explained that the Commonwealth Court had previously recognized, in *PSU/PMA Ins. Group v. WCAB (Hensal)*, 911 A.2d 225 (Pa.Cmwlth.2006) (*en banc*), that the subject of defined-benefit plans is particularly amenable to expert testimony, as follows:

[C]ollective funding and the potential for post-retirement funding create unique hurdles to proving an employer's defined benefit contribution for pension offset purposes. Because an appreciation of the funding of defined benefit pension plans requires knowledge beyond that possessed by laypersons, it is a subject particularly amenable to testimony by experts. *See* Pa.R.E. 702. This approach is consistent with common sense and with testimony that the extent to which an employer funded a particular employee's defined benefit pension can only be determined by an actuarial formula.

*Hensal*, 911 A.2d at 232. He also highlighted that Employer's presentation was nearly identical to evidence deemed suffi-

cient to validate a pension offset in *DPW/W. Ctr. v. WCAB (Cato)*, 911 A.2d 241 (Pa.Cmwlth.2006). *See id.* at 246 ("Because an employer may sustain its burden of proof for offset purposes through expert actuarial opinion, and the WCJ here found Employer's offer of this evidence credible, Employer is entitled to an offset.") (footnote omitted).

Claimant appealed, contending that the WCJ's decision was flawed, as it was based on calculations which were arbitrary, speculative, inequitable, and infected with inappropriate or biased assumptions. The Workers' Compensation Appeal Board (the "WCAB" or the "Board") remanded for additional findings and conclusions, reasoning that the WCJ's findings were insufficient and lacked critical findings of fact.

Initially, the WCAB noted that, under *DPW/Polk Ctr. v. WCAB (King)*, 884 A.2d 343 (Pa.Cmwlth.2005), Employer bore the burden to establish the extent of its funding of the Claimant's pension. *See id.* at 347. The Board then criticized the WCJ's findings of fact, indicating that they consisted only of procedural history and summaries of Employer's witness testimony. In this regard, the WCAB found the findings in *Cato* to have been more specific. *See Cato*, 911 A.2d at 244–45 (quoting the findings of fact of the workers' compensation judge). In addition to requiring a more developed opinion, the Board also directed the WCJ to reopen the record to additional evidence concerning the actual present value of Claimant's pension fund contributions based on the historical rates of return of the SERS pension fund. According to the Board:

> While expert opinion testimony was received concerning that issue, such opinion testimony is of virtually no use compared to evidence reflecting actual historical earnings information of the amounts earned by Claimant's contributions. *Sholcosky.* Moreover, the use of an estimated, artificially low rate of return for Claimant's historical pension fund contributions would give [Employer] an artificially high offset against Claimant's workers' compensation benefits, and would essentially result in using Claimant's pension fund earnings to fund [Employer's] workers' compensation obligation, in violation of public policy. *See generally Lyons*

*v. Workmen's Comp. Appeal Bd. & City of Los Angeles*, 44 Cal.App.3d 1007, 119 Cal.Rptr. 159 (Cal.Ct.App.1975) (holding that the labor code prohibited the employer from receiving, either directly or indirectly, contributions from employees to cover the cost of workers' compensation).

*Harvey v. DPW*, No. A07–0986, *slip op.* at 7 (WCAB Apr. 4, 2008).[5] Furthermore, the Board "strongly suggest[ed]" that the WCJ employ the broad investigatory power afforded under Section 420 of the WCA, 77 P.S. § 831, to appoint an impartial expert to assist him in ascertaining the facts with respect to Employer's funding of Claimant's pension. *Id.* at 8.

The WCAB recognized that an employer may utilize expert actuarial testimony establishing the present value of the claimant's future income stream. *Harvey*, No. A07–0986, *slip op.* at 2 (citing *Hensal*, 911 A.2d at 225). With respect to other relevant facts, however, the WCAB indicated that expert testimony consisting of "opinion evidence ... must be considered of low grade and should be afforded little weight against positive testimony of actual facts." *Id.* at 2 (paraphrasing *Commonwealth v. Sholcosky*, 553 Pa. 466, 480, 719 A.2d 1039, 1046 (1998) (Saylor, J., dissenting), and citing *In re Estate of Cline*, 433 Pa. 543, 547, 252 A.2d 657, 660 (1969)). Thus, the Board required submission of "evidence concerning the actual present value of Claimant's pension fund contributions based on the historical rates of return of the SERS pension fund" to support an offset. *Id.* at 10.

On further appeal, the Commonwealth Court reversed and reinstated the WCJ's order. *See DPW v. WCAB (Harvey)*, 960 A.2d 957, 963 (Pa.Cmwlth.2008). In the first instance, the court observed that, contrary to the WCAB's perspective, the WCJ made all necessary credibility determinations. *See id.* at 964 (relating that the WCJ "expressly credited [Employer's two witnesses] and detailed the reasons for so doing."). Second, the court determined there were no missing critical

5. Thus, while the Board superficially directed compliance with *Cato*, its additional commentary reflected its effective disavowal of *Cato*, in which the Commonwealth Court had sanctioned an offset on evidence very similar to Employer's evidence here. *See Cato*, 911 A.2d at 246.

findings. *Id.* ("To have the WCJ determine the amount of Claimant's pension fund contributions by establishing the rates of return of the SERS pension fund for each year of Claimant's contribution would send the WCJ on a meaningless mission."). The Commonwealth Court highlighted that it previously had accepted the legal sufficiency of an actuarially assumed rate of annual return in *Cato* and *Hensal:*

> [S]ince an employer cannot provide evidence of actual contributions for the use of an individual member of a defined benefit pension plan, it may meet its burden of proof, as Employer attempted to in this case, with expert actuarial testimony. Employer's expert evidence here, if accepted as credible, is legally sufficient to establish the extent to which Employer funded Claimant's defined benefit pension for purposes of offset.

*Harvey,* 960 A.2d at 964 (quoting *Hensal,* 911 A.2d at 232) (emphasis deleted); *id.* at 964–65 ("In sum, this Court already decided that the expert evidence presented in *Hensal* and *Cato* was legally sufficient; therefore, the legal sufficiency of identical evidence in the present appeal is governed by controlling precedent.").[6]

Senior Judge McCloskey concurred in the result, indicating that when the actual rate of return can be determined for each year an employee worked, then that rate, rather than an assumed rate, should be used in calculating the offset. *Harvey,* 960 A.2d at 965 (McCloskey, S.J., concurring).

We allowed Claimant's appeal on a limited basis to consider his position that the use of the actuarially assumed rate of return in the Section 204(a) offset calculations is inconsistent with the statutory limitation of the credit to the employee-funded portion of a pension.

Presently, Claimant maintains that actual data establishes that Employer contributed very little to Claimant's defined-

6. The Commonwealth Court's opinion also addresses several matters outside the scope of the issues accepted for our present review, including the cognizability of the appeal in light of its interlocutory nature and corrections to the specific figures specified in the WCJ's order. *See Harvey,* 960 A.2d at 962–63, 965.

benefit plan during his work years. Claimant thus criticizes the offset formula applied by SERS as creating a distorted picture of the employer funding component. *Accord* Brief for *Amicus* Pennsylvania Association for Justice ("PAJ") at 12 ("Simplistic formulas based upon presumptions contrary to reality, such as used here, ignore the statutory mandate and should be rejected[.]").[7] Permitting such abstract actuarial estimates to control, Claimant asserts, entails speculation and thus violates the requirement of substantial, competent evidence to support a workers' compensation judge's findings. *See Gibson v. WCAB (Armco Stainless & Alloy Prods.)*, 580 Pa. 470, 479–80, 861 A.2d 938, 943–44 (2004). According to Claimant, the net effect is to shift, unfairly, the burden of establishing the propriety and accuracy of a credit to injured workers. Since, in Claimant's view, such burden may be insurmountable, he contends that the Commonwealth Court's decision inappropriately undermines the humanitarian purposes of the Workers' Compensation Act. *Cf. King*, 884 A.2d at 348 ("The Act's purpose [of benefiting injured workers] would not be served by allowing an employer to unilaterally take a credit toward an award of benefits and then placing the burden on a claimant to access employer's records and present evidence as to the appropriateness of the credit."); *Hensal*, 911 A.2d at 233–36 (Smith–Ribner, J., dissenting). Claimant regards the allocation of any burden to employees as being particularly inequitable, in light of employers' superior access

7. Along these lines, Claimant observes that the difference between actual experience and the value assigned by SERS is made apparent by the fact that the same rate-of-return assumption is being used across the board in all cases, thus defying economic reality. *See, e.g.*, Brief for Appellant at 16 ("Clearly, the rates of return on investments have decreased dramatically in recent years, with negative returns becoming the norm and [Claimant] was therefore penalized by these actuarial assumptions that accounted for actual contributions in 2000 and 2001, despite the fact that either very little or no such contributions were ever made during more than a year and a half of [Claimant's] service with the Commonwealth."); *id.* at 16–17 (complaining that the testimony of Employer's witnesses is the same in all of the cases, despite significant differences between the contributions made by the employees, their differing dates of service, and other significant factual differences, and asserting that "the employer here has claimed the same percentage pension offset in every reported case, a result that, on its face, is not possible." (emphasis omitted)).

to raw data and the incentive to overestimate their own contributions and the associated returns.

Claimant recognizes the challenge in identifying pension-specific employer contributions and associated returns in retirement plans on the scale of the Commonwealth's. Nevertheless, he maintains that, to the degree Employer cannot produce actual data, it simply lacks a remedy. In this regard, Claimant references a line of decisions in which this Court has identified situations in which no redress exists to vindicate positive statutory mandates. *See* Brief for Appellant at 33–35 (citing *Salazar v. Allstate Ins. Co.*, 549 Pa. 658, 669–70, 702 A.2d 1038, 1044 (1997)). Any harshness associated with such result is mitigated, from Claimant's perspective, by the substantial compromise of employee rights and entitlements inherent in the workers' compensation scheme.[8] Claimant argues that a contrary approach would permit an employer to reduce its obligations under the Act by using the employee's own retirement funds, a result manifestly contrary to Section 204(a). *See Hensal*, 911 A.2d at 227–28. Finally, Claimant highlights that, in light of the WCA's humanitarian purposes, borderline interpretations are to be construed in favor of injured workers. *See Hannaberry HVAC v. WCAB (Snyder)*, 575 Pa. 66, 73, 834 A.2d 524, 528 (2003).

To Claimant's arguments, his *amicus*, the Pennsylvania Association for Justice, adds the observation that there are funds reposited with SERS that do not reflect the contributions of the Commonwealth as the employer, thus undermining the exclusion-based methodology employed by Employer's expert and consultant. For example, the Retirement Code permits participation in SERS by certain non-Commonwealth employers; therefore, "employees of employers who are not the Commonwealth contribute to the SERS making that money available for pension payments." Brief for *Amicus* PAJ at 7. Additionally, a statutory rate of four percent interest is

8. *See generally Commonwealth v. Corban Corp.*, 598 Pa. 459, 465, 957 A.2d 274, 277 (2008) (explaining that "the Act's intended purpose . . . is to provide payment to the injured worker commensurate with the damage from accidental work-related injury, as a fair exchange for the surrender of every other right of action against the employer.").

applied to benefits withdrawals; however, the actuarial evidence incorporates the assumed return rate of 8.5 percent. According to *amicus*, the difference is not rightfully attributable to employer funding, yet, it is credited to employers under the exclusion-based methodology for offset calculation. *See id.* at 7–8.

On the other hand, Employer, and its *amici*,[9] maintain that the decision of the workers' compensation judge is legally correct and supported by substantial and competent evidence, including the actuarial consultant's testimony. They respond to Claimant's no-remedy argument by reference to the mandatory terms of Section 204(a)'s requirement of a pension-benefit offset, which confirms the General Assembly's manifest intention to afford redress.[10] This, Employer and its *amici* contend, is also confirmed by a legislative history reflecting a deep concern with improving the workers' compensation system to control rising insurance costs.[11] *Amicus* SDIC, in particular, places the relevant provisions of Section 204(a) in the context

9. Employer's *amici* are The Public School Employees' Retirement System ("PSERS"), School Districts Insurance Consortium ("SDIC"), and The Pennsylvania State University ("PSU"). PSERS advises that it uses substantially the same methodology as SERS to calculate workers' compensation offsets; SDIC indicates that it manages workers' compensation claims for various public school districts throughout the Commonwealth; and PSU asserts an interest as a self-insured employer in Pennsylvania and a member of SERS contributing funding on behalf of more than 6,500 employees.

10. *See, e.g.,* Brief for Appellee at 20 ("Appellant's argument would therefore necessitate the absurd result of eliminating the pension offset in all cases as the Legislature did not prescribe any specific methodology for its calculation."); Brief for *Amicus* PSU at 49–50 ("In keeping with the express language of the Act and the pertinent regulations, it is not appropriate to pretend that because there is inherently some modicum of residual uncertainty, the underlying entitlement does not exist for employers with defined-benefit pension plans.").

11. *See* Reply Brief for *Amicus* PSU at 8 (characterizing the objective of Section 204(a) as "to save employers from excessive financial burden, while eliminating a financial windfall to injured employees" (citing, *inter alia, Kramer v. WCAB (Rite Aid Corp.),* 584 Pa. 309, 336–38 & n. 15, 883 A.2d 518, 534–36 & n. 15 (2005))); *accord* Brief for *Amicus* SDIC at 11 ("The policy that culminated in the enactment of those offsets contemplated by Section 204(a) of the Act, seeks to reduce the costs of Pennsylvania work injuries by prohibiting injured employees from receiving double wage loss benefits[.]").

of the Legislature's broader cost-containment efforts, including the introduction of medical fee caps, utilization review, healthcare self-referral prohibitions, impairment ratings, and other offsets designed to "allow[ ] employers to avoid paying duplicate benefits for the same loss of earnings." Brief for *Amicus* SDIC at 15 (quoting *Kramer*, 584 Pa. at 338, 883 A.2d at 536) (emphasis removed).

The bulk of the presentations on Employer's side focus on the nature of a defined-benefit plan, including the *en masse* nature of plan administration particularly from the employer's perspective; the need to account for present and future fund obligations in determining the amount of periodic employer contributions; the disconnect between such specific, class-wide contributions and overall funding in light of the many pertinent variables; the ongoing and open-ended character of employers' obligation to maintain plan solvency throughout the variable period of retirees' lifetimes; the absence of any preretirement set-aside directly allocable to individual employee accounts; the concomitant inability to trace actual employer funding to specific accounts; and the necessary resort to actuarial assumptions about future performance to intelligently and responsibly administer a system on the scale of SERS which is subject to such complexities.

Amicus PSU puts the point succinctly, as follows:
[I]n a defined-benefit pension plan[,] the employer will make varying advance "contributions" over the years toward its actuarially estimated global liabilities, in an effort to maintain the overall solvency and proactively fund the plan through periods of good and bad investment performance. ... Because no advance "contributions" to proactively "fund" the plan are specifically earmarked for an individual employee in a defined-benefit plan, [Section 204(a) effectively] compels the use of an actuarial formula to determine the offset amount.

Brief for *Amicus* PSU at 33–34 (emphasis deleted).[12] The idea is that an employer's past, present, and future contribu-

12. As additional support for this thesis, Employer references the following passage from a workers' compensation treatise:

tions combine to fund ongoing pension installments exceeding the amounts deriving from employee preretirement contributions.

Employer thus regards defined-benefit plans, including the employer-funded component, as being inextricably intertwined with actuarial science and associated assumptions. Accordingly, it is its position that the employer-funding component must necessarily be assessed in such light. Employer explains that the introduction of expert opinion evidence is appropriate to develop the necessary actuarial assumptions and the methodology of which they are an integral part. *Accord Hensal,* 911 A.2d at 232 ("Because an appreciation of the funding of defined benefit pension plans requires knowledge beyond that possessed by laypersons, it is a subject particularly amenable to testimony by experts.").[13] Employer strongly differs with the position that actuarial assumptions render the methodology speculative, relating that the standard governing the sufficiency of expert opinion evidence requires reasonable certainty, not mathematical exactness. *Cf. Lach v. Fleth,* 361 Pa. 340, 352, 64 A.2d 821, 827 (1949).

*Amicus* SDIC offers the following counterpoint to Claimant's observations about SERS's enjoyment of a high rate of return during some of his working years:

> Because investment returns and benefits costs are *ex ante* uncertain, the employer contributions serve as a "balancing mechanism" designed to smooth away shortfalls and excesses (as the employer is ultimately liable to the employee for payment of the promised benefit). They may be "above average" in some years and "below average" in others, and neither has any impact on the benefits ultimately received by employees under a defined benefit plan. To look only at returns and employer contributions during a brief period of time ignores how pensions are administered in light of the uncertainties surrounding returns and benefit costs and ignores the fact that the employer's obligation and contributions do not end at the employee's retirement.
>
> TORREY & GREENBERG, PENNSYLVANIA WORKERS' COMPENSATION LAW & PRACTICE § 12.89 (2008).

**13.** Employer also notes that the *King* decision, relied upon by Claimant, *see* Brief for Appellant at 19 n. 11, also implicitly requires expert testimony via its holding that the employer's evidence was insufficient because it failed to explain the derivation of interest rate and actuarial calculations. *See King,* 884 A.2d at 347.

In 2008, because of the collapse of the global economy and the global investment markets, the SERS Fund produced a 2008 return, net of fees, of –28.7%. See (*2008 Commonwealth of Pennsylvania State Employees' Retirement System Comprehensive Annual Financial Report* at pp. 4, 9). The ramifications of an isolated assessment of market performance would be devastating and unsustainable. The System's ten-year annualized investment rate was 10.1% for the year ending 2007—a figure that exceeded the approved assumed rate of investment return. The 2008 performance of the System's investment portfolio reduced the System's ten year annualized investment return to 4.9%. The foregoing performance statistics not only reveal how variable rates of return are in the short-term, but underscore the harm that such a focused approach could cause both the sponsoring employer and the injured worker who might choose[ ] to apply for his or her SERS pension during a down market. Indeed, if the actual 2008 rate of investment return were utilized in assessing employer liability the burden on the employer would be catastrophic.

Brief for *Amicus* SDIC at 32 n. 34. Particularly in light of the volatility of investment performance in the short term, SDIC indicates, a year-by-year assessment of returns is not an acceptable method for administering the funding of defined-benefit plans. Rather, SDIC contends, to properly monitor employer liability under such a plan—and to assure the viability of the overall system—"the assumed rate of investment return must represent the expected rate of return *over the long term* and should not be altered to reflect fluctuations in the financial market that are transitory." *Id.* at 32 (citing DAN M. McGILL, FUNDAMENTALS OF PRIVATE PENSIONS 612 (8th ed. 2005)) (emphasis in original).

Responding to the additional arguments of Claimant's *amicus,* Employer notes that the Commonwealth bears responsibility for funding the share of anticipated pension benefits in relation to its own employees after subtracting the employee's share. *See* 71 Pa.C.S. § 5507. Accordingly, it is Employer's position that the commingling of contributions from other

participating employers in SERS does not result in its gaining credit for other employer contributions. *See* 71 Pa.C.S. § 5951 (prescribing that the "payment of all annuities and other benefits granted by the board" are "obligations of the Commonwealth"); *see also* Reply Brief for *Amicus* PSU at 6 ("The fact that a few non-'Commonwealth' employers such as [PSU] participate in SERS, simply allows SERS to maximize the financial benefit of group investing directed by SERS' board and professional staff, and changes nothing.").

With regard to residual investment returns attributable to employee contributions withdrawn at 4 percent interest, Employer and its *amici* explain that such returns are not one of the three material sources of SERS funding (employer contributions, employee contributions, and investment returns) identified in the unrefuted evidence presented at the hearing before the WCJ. Moreover, Employer observes that the actuarial consultant, deemed credible by the WCJ, was aware of the use of the four percent statutory rate of interest pertaining to benefits withdrawals; nonetheless, he opined that the offset and underlying methodology were appropriate within a reasonable degree of actuarial certainty. Furthermore, *amicus* PSU criticizes the effort to insert additional fact-based contentions into the arguments at the appellate stage.[14] Ultimately, it is Employer's position that the possibility of other nominal sources of funding already has been considered in the overall actuarial assessment and goes at most to the weight, rather than the legal sufficiency, of its expert evidence.

Finally, SDIC, in particular, emphasizes the deference owing to administrative interpretations by agencies charged with execution and application of governing statutes. *See Kramer*, 584 Pa. at 328–29, 883 A.2d at 529–30. Here, it regards SERS as the relevant agency for assessing pension benefits and associated funding.

---

**14.** *See* Reply Brief for *Amicus* PSU at 5 ("The fact that the Employer had the burden of adequately proving the extent of its entitlement to an offset, does not excuse [Claimant] from exploring issues in cross examination or presenting evidence challenging Employer's evidence, if any had existed.").

■ Our appellate review in the administrative law context is limited. *See* 2 Pa.C.S. § 704. As relevant here, however, we review challenged legal conclusions on a plenary basis and may consider whether material findings of fact are supported by substantial evidence. *See id.*

■ Initially, Claimant raises a matter of statutory construction—whether, in Section 204(a), the Legislature contemplated a precise allocation of actual, existing employer funding to specific pension accounts and, therefore, eschewed actuarial input. As the Commonwealth Court noted in *Hensal,* the statute does not explicitly require an employer to prove the amount of its actual contributions. *See Hensal,* 911 A.2d at 232. Instead, the relevant offset provision focuses on the extent to which benefits are funded by the employer. *See* 77 P.S. § 71(a). Furthermore, while the General Assembly provided for a credit, it left the formula for determining it to others. Thus, we find Section 204(a) to be ambiguous as to how the Legislature contemplated employer-funding would be assessed. In view of the ambiguity, resort to tools of statutory construction is appropriate, including consideration of the occasion and necessity for the statute, the object to be attained, the consequences of a particular interpretation, the contemporaneous legislative history, and administrative interpretations. *See* 1 Pa.C.S. § 1921(c).

■ Here, Employer and its *amici* correctly relate that the purpose of the Section 204(a) offset is to foster cost containment in the workers' compensation insurance arena. *See Kramer,* 584 Pa. at 336–38 & n. 15, 883 A.2d at 534–36 & n. 15. We are now well familiar with various, substantial modifications which are being made in a number of different substantive arenas to reduce insurance costs by redirecting the onus of the compensation scheme.[15] Moreover, in our view, Claimant's no-remedy argument proves too much, as the Legislature's clear intention was to afford effective redress. *See* 77

---

15. For example, in the arena of automobile insurance, the General Assembly has materially revised the statutory scheme to effectively shift the cost of an injured party's recovery from the tortfeasor's liability policy to first-party benefit providers, with the aim of reducing the cost of mandatory liability coverage. *See* 75 Pa.C.S. §§ 1720, 1722.

P.S. § 71(a) (providing that employer-funded pension benefits "shall" be credited against workers' compensation awards).[16] Therefore, if actuarial assessment represents the most reasonable approach to quantifying employer funding pertaining to individual defined-benefit pensions, it seems highly unlikely that the General Assembly would have disapproved it. Indeed, the support by SERS (as the administrative agency charged with administering the state pension system) for the use of actuarial calculations to determine employer funding of pensions militates in favor of a construction allowing it. *See* 1 Pa.C.S. § 1921(c)(8).

Since, with reference to tools of statutory construction, we find nothing that precludes the sound use of actuarial principles in evaluating employer funding in defined-benefit pension plans, it remains to determine whether the testimony of Employer's expert and consultant provided substantial evidence to support the WCJ's findings. Claimant and the WCAB reference observations by this author from the *Sholcosky* decision as supporting the position that actual data must be preferred over expert opinion evidence.

The referenced *Sholcosky* dissent distinguished between fact and opinion testimony in terms of an evidentiary rule permitting the admission of prior inconsistent statements as substantive evidence, taking the position that the rule should operate to allow the admission of fact-based, but not opinion-

---

**16.** While the Legislature clearly intended an offset, this author, at least, remains circumspect about the suggestion that the object of the remedy was to eliminate a windfall or double recovery, *see supra* note 11, particularly since the workers' compensation scheme already is premised upon substantial compromises of employer and employee rights and entitlements. Such compromise entails the standardization of treatment across a decidedly non-uniform universe of cases; the discounting of wages to determine compensation for injuries; and the further curtailment of non-economic damages. *See Selected Risks Ins. Co. v. Thompson*, 520 Pa. 130, 142–143, 552 A.2d 1382, 1388 (1989) (explaining that workers' compensation "only covers a fraction of what tort damages would cover, (e.g., compensation does not provide 100% of wage loss coverage, nor pain and suffering, nor other consequential damages.)").

Parenthetically, in light of the questions framed, this case does not require us to consider the extent to which continuing benefits curtailments reconcile with constitutional norms.

based testimony. *See Sholcosky,* 553 Pa. at 479–80, 719 A.2d at 1046 (Saylor, J., dissenting). The rationale was that admitting opinion evidence under the rule would obscure the requirement to establish a factual basis for the opinion and inject confusion into jury deliberations by requiring them to select between two conflicting opinions offered by the same expert. *See id.* at 481, 719 A.2d at 1046–47 (Saylor, J., dissenting).

The present matter bears no similarity to *Sholcosky.* Here, Employer's expert testimony was internally consistent, and the factual basis was provided, *inter alia,* in the form of investigations and reports performed by SERS's actuarial consultant. While the actuarial evidence contains an inherent predictive element, the arguments of Employer and its *amici* amply develop that such predictions are a staple of the discipline and a core component of defined-benefit pension-system valuation. *Accord* JERRY S. ROSENBLOOM, THE HANDBOOK OF EMPLOYEE BENEFITS 1232 (6th ed. 2005) (explaining that "the very core of the process of costing and funding defined retirement programs is the concept of actuarial present value. This involves computing how much money should be set aside today to pay certain benefits in the future."). This Court recognizes the practical necessity of expert opinion testimony in matters well beyond lay experience, and we hold that actuarial assumptions and calculations may form the basis for a reasoned determination of the employer-funded component of a defined-benefit pension.

Accordingly, as the Commonwealth Court held, the WCJ properly credited the consultant's testimony that the nature of a defined-benefit plan impedes direct tracing and quantification of employer funding, and that actuarial science offers a rational alternative consistent with the nature of this type of plan. *Accord City of Phila. v. WCAB (Grevy),* 968 A.2d 830, 839 (Pa.Cmwlth.2009) (explaining that, "[i]f the actuarial testimony is accepted as credible, it is legally sufficient to establish the extent of an employer's funding for offset/credit purposes"). Similarly, acceptance of the calculation methodology—entailing crediting the employee's past contributions, coupled with an actuarially justified rate of return over

Claimant's projected life expectancy and attribution of the balance of each pension payment to Employer's past, present, and future contributions—was within the prerogative of the WCJ. Moreover, the WCAB was not free to deviate from the existing Commonwealth Court precedent, either in terms of the deferential review required relative to credibility determinations or the ability of Employer to satisfy its burden using expert testimony. *See supra* note 5.

Finally, we acknowledge Claimant's concern with burden shifting, but, at least as a practical matter, some burden of going forward with contrary evidence generally ensues after the party bearing the initial burden puts forward a credible *prima facie* case. We also realize that borderline interpretations are construed in favor of injured parties in the workers' compensation setting. Nevertheless, we do not regard the present interpretation as a borderline one.

The order of the Commonwealth Court is affirmed.

Former Justice GREENSPAN did not participate in the decision of this case.

Chief Justice CASTILLE, Justices EAKIN, BAER, TODD and McCAFFERY join the opinion.