In re ESTATE OF Marjorie
J. CRUCIANI.

Appeal of Jeannine M. McCullough.

Superior Court of Pennsylvania.

Submitted Aug. 17, 2009.

Filed Nov. 30, 2009.

struction could have cured the prejudice to Appellant. As I would remand for a new guilt-phase trial, I would grant Appellant a new penalty phase proceeding.

Kevin T. Fogerty, Allentown, for appellee.

Jeannine M. McCullough, pro se, for appellant.

BEFORE: PANELLA, POPOVICH, and COLVILLE *, JJ.

OPINION BY POPOVICH, J.:

¶ 1 Appellant Jeannine M. McCullough appeals the order holding that the signature on the last will and testament of Marjorie J. Cruciani, deceased, which document was submitted to probate by Appellant, was a forgery. We affirm.

¶ 2 A review of the record establishes that Marjorie J. Cruciani died on the 11th day of February, 2007, in Lehigh County, Pennsylvania. The decedent was survived by her husband (Angelo J. Cruciani, Jr.), son (Robert J. McCullough), and two daughters (Irene McCullough and Appellant). On February 21, 2007, Irene McCullough filed a petition for probate and grant of letters with the Register of Wills. On the same day, Angelo J. Cruciani, Jr. filed a renunciation of his rights to administer the estate, and the Register of Wills granted letters of administration to Irene McCullough. On February 26, 2007, notice of the preceding events were sent to the decedent's beneficiaries, all of whom (save for Appellant) believed at that point in time that she died intestate.

¶ 3 It was not until June 21, 2007, that Appellant filed a petition for probate and grant of letters *pendente lite* with the Register of Wills, which was based upon the last will and testament of Marjorie J. Cruciani. On the same day, the Register of Wills revoked letters of administration granted to Irene McCullough. On June 26, 2007, the Register of Wills revoked the letters of administration *pendente lite* previously issued to Appellant and granted letters of administration to Angelo J. Cruciani, Jr. (petitioner) to act as administrator of decedent's estate pursuant to petitioner's "Petition for Probate and Grant of Letters C.T.A." Thereafter, on September 18, 2007, petitioner filed an appeal from the Register of Wills' order admitting Appellant's last will and testament of Marjorie J. Cruciani to probate because petitioner alleged that the decedent's signature was a forgery. The Orphans' Court, by order dated October 5, 2007, granted petitioner's request for a citation to schedule the matter for an evidentiary hearing to resolve the authenticity of decedent's signature. After the evidentiary hearing, the Orphans' Court sustained petitioner's appeal: "[T]he [Orphans'] Court having found that the signature on the document dated December 15, 2005 submitted to probate purporting to be that of Marjorie J. Cruciani is a forgery [...]." *See* Order dated October 2, 2008; Record No. 14. Appellant filed a timely notice of appeal challenging the Orphans' Court's finding that the decedent's signature was a forgery.[1]

---

* Retired Senior Judge specially assigned to the Superior Court.

¶ 4 Preliminarily, we note our standard of review when considering appeals from the Orphans' Court:

> When reviewing a decree entered by the Orphans' Court, this Court must determine whether the record is free from legal error and the court's factual findings are supported by the evidence. Because the Orphans' Court sits as the fact-finder, it determines the credibility of the witnesses, and on review, we will not reverse its credibility determinations absent an abuse of discretion.

*In re: Estate of Presutti*, 783 A.2d 803, 805 (Pa.Super.2001) (citation omitted). Also, the party alleging forgery has the burden of proving the existence of the forged document by clear, direct, precise, and convincing evidence. *In re Estate of Smith*, 454 Pa. 534, 314 A.2d 21 (1974); *Cline Will*, 433 Pa. 543, 252 A.2d 657 (1969). Further, we observe that because forgery presents an issue of fact, the resolution of the issue necessarily turns on the court's assessment of the witnesses' credibility. *In re Estate of Heiney*, 455 Pa. 574, 318 A.2d 700 (1974). Lastly, with regard to the testimony of a handwriting expert, we have held that where the testimony is corroborated by probative facts and circumstances surrounding the will such may overcome the testimony of the subscribing witnesses. *In re Kirkander*, 326 Pa.Super. 380, 474 A.2d 290, 293 (1984).

¶ 5 In the current case, Irene McCullough's testimony was found to be credible by the Orphans' Court along with all of her other witnesses: Angelo J. Cruciani, Jr. (decedent's husband of thirty-one years), Lee A. Conrad, Esquire (attorney hired initially to handle the estate), Barbara Gerken (real estate agent/appraiser), and Edward J. Kelly (handwriting expert).

¶ 6 When Irene McCullough took the stand, she indicated receiving cards and letters from her mother throughout her life, which underscored her belief that the signature on the will was not decedent's: "It's far too neat and perfect." N.T., 9/30/08, at 19. After December 15, 2005 (date of the will), Irene McCullough was told by her mother that there was no will in existence. In fact, after Marjorie J. Cruciani was diagnosed in October of 2006 with myelodysplastic, she was asked whether she had signed anything giving Appellant any property, Irene McCullough testified: "[M]y mother said, 'Absolutely not.'" *Id.* at 41. Likewise, the husband indicated that decedent never mentioned having signed a will during her lifetime, nor did the real estate agent/appraiser recall Appellant ever remarking about having a life estate by reason of the decedent's will when the real estate was placed on the market for sale. *Id.* at 72, 95.

¶ 7 In February of 2007, Attorney Conrad was hired by Irene McCullough to handle decedent's estate. At the first meeting of beneficiaries, which was attended by decedent's children and husband, Attorney Conrad asked all attendees if there was a will in existence, and all said, "No." N.T., 9/30/08, at 48. In the absence of a will, and the husband renouncing his right to serve as administrator, Irene McCullough was selected by the husband to act in his stead, which did not sit well

---

1. A review of the record discloses that the Orphans' Court, after receiving notice of Appellant's appeal, specified in writing the place in the record where the reasons for the order appealed could be found. *See* Orphans' Court's "Pa.R.A.P.1925(a) Statement;" Record No. 22. However, the Orphans' Court did not enter an order directing Appellant to file of record a concise statement of the matters complained of on appeal. *See* Pa.R.A.P. 1925(b).

with Appellant and caused her to secure representation. Thereafter, Attorney Conrad learned of decedent's will through Appellant's present (sixth) attorney, which devised to Appellant a life estate in decedent's homestead. However, when a copy of the document came into Attorney Conrad's possession, he noticed that a signature (Sherry Bauer's) and typed name (Appellant's) did not appear appropriately situated; to-wit: The "acknowledgement" contained on page two had Appellant's name typed as an attesting witness, but Sherry Bauer's signature appeared above where "Witness" had been typed on the first page of the document, which was notarized by Mary Ann E. Reilly and allegedly signed by "Marjorie J. Cruciani" as her will. Moreover, when Attorney Conrad located Mary Ann E. Reilly, she failed to produce her ledger, which by Pennsylvania law a notary is required to maintain to chronicle each act.

¶ 8 The last witness to testify for petitioner was Edward J. Kelly, whose qualifications as an expert were stipulated to by Appellant. Mr. Kelly described the methodology utilized in examining the December 15, 2005, document as "image-enhanced comparative analysis" (simple magnification), which consisted of reviewing photocopies of six checks containing decedent's signature. These known signatures were compared with the signature on the document dated December 15, 2005. The expert testified that the differences between the check signature and will signature were "profound." N.T., 9/30/08, at 120. As a result, he opined, within a reasonable degree of forensic scientific professional certainty, that decedent's signature on the December 15, 2005, document was "a forgery[.]" *Id.* at 123.

¶ 9 To counter the assertion that the decedent's signature was a forgery, Appellant testified *via* telephone, but the notary (Mary Ann E. Reilly) and the attesting witness (Sherry M. Bauer) appeared in court. Ms. Reilly recalled being contacted on December 15, 2005, by Ms. Bauer to meet at a restaurant in Allentown, Pennsylvania, to do notary work involving decedent and Appellant, both of whom she had met in 2002. Ms. Reilly recounted how in 2002 she observed a handwritten document (supposedly a will) by decedent being witnessed by Appellant. As a result, in anticipation of decedent updating her 2002 handwritten document and before leaving for the restaurant, Ms. Reilly printed an acknowledgment listing decedent as affiant and Appellant as a subscribing witness in preparation for any will revisions that might take place at the December 15th meeting.

¶ 10 Once at the restaurant, Ms. Reilly was asked whether the 2002 handwritten document was legal. She said, "Yes," but decedent decided to revise it anyway to look more professional. This was facilitated by Appellant's laptop computer contained in her car, which served as the tool to create decedent's will. Once the revisions were approved by decedent, Appellant drove to a nearby Staples to have the computer-generated will printed and two copies made of the finished product. After returning with decedent's will, Appellant combined the first page of the will with the second page acknowledgement, the former of which was signed "Marjorie J. Cruciani," attested to by "Sherry M. Bauer" (even though Appellant's name had been typed in advance as the subscribing witness on the acknowledgement page prepared by Ms. Reilly),[2] notarized, and dated

---

2. When Ms. Reilly was asked why she did not change the typed name of Appellant on the

acknowledgement page to that of "Sherry Bauer," she answered: "Because, at the

December 15, 2005.[3] The events recounted by Appellant and her witnesses were found by the Orphans' Court to be "incredible," and the reasons for doing so are recited below, as herein relevant; to-wit:

> THE COURT: [...] We accept the testimony of the handwriting expert, find it credible, find his opinion to be reliable, find it based upon facts, and find it to make sense to us.
>
> \*   \*   \*   \*   \*   \*
>
> [... A]nd we accept all of the other testimony of the witnesses presented by the Petitioner and find all of it credible.
>
> Now, the question is, what about the testimony from [Appellant] and is it credible?  And I want to point out some things and some findings.

time—I, I don't know why I didn't." N.T., 9/30/08, at 181.

3. The first page of the document purporting to be decedent's will states:

> December 15, 2005
> I Marjorie J. Cruciani, being of sound mind, bequeath my daughter [Appellant] a place on my property at 2577 Old Post Road, Coplay, Pa., 18037.  That address being 2577 Old Post Road, Coplay, Pa., 18037.  [Appellant] and I have spoken about her leaving for long periods of time.  She sometimes wants to go to California where she has an apartment she sublets, or to spend long periods of time visiting with her dad in Kingston, New York. I have no problem with this as long as the bills we agreed upon are paid.  I use the house when she's gone to paint or just relax in the patio room which she had constructed and paid $18,133.00 for along with detailing and tiling the floor.  No matter where [Appellant] goes or how long she's gone this is always to be considered her home that she can come back to.  For all these gracious things she has done for me, I want her to reside at 2577 Old Post Road, Coplay, Pa. for the remainder of her life.  This is a gift from me to her with no monetary payment required.  The only bills [Appellant] will be responsible for are her phone and the cost of propane.

The document, the original document of December 15, 2005 is in the court file—the Register of Wills file, I should say, which I have before me and have had before me in the hearing, and I gave the original to some of the witnesses to look at—particularly Mary Ann Reilly—and it is noteworthy that the stationery used is, for both pages, is exactly the same stationery and it is significant because it's not just a typical white copy paper.  It has a texture.  It's got a texture to it.  I forget what they call it, but it's—I don't know—a cotton weave or something, but it definitely has a texture to it and it's the exact same texture on both pages.  That is significant since Mary Ann Reilly said she brought the second page with her and

> My daughter [Appellant] has health issues and this is my way of helping her heal and have a stable life.

| /s/ Mary Ann E. Reilly | /s/ Marjorie J. Cruciani |
|---|---|
| Notary | Marjorie J. Cruciani |

| December 15, 2005 | /s/ Sherry M. Bauer |
|---|---|
| Date: | Witness |

[Notarial Seal was affixed here.]

The second page (attached to the first page) of the purported will of the decedent provided:

> ***COMMONWEALTH OF PENNSYLVANIA COUNTY OF LEHIGH***
> On this, the fifteenth (15) day of December, 2005 before me, a notary public in and for the county of Lehigh, personally appeared before me Marjorie J. Cruciani and [Appellant] known to me to be the persons whose name is [*sic*] subscribed to the within instrument and acknowledge that they executed the same for the purposes therein contained.
> In witness thereof, I hereunto set my hand and official seal.
>
> /s/ Mary Ann E. Reilly
> Notary Public
>
> December 15, 2005
> Date:
> [Notarial Seal was affixed here.]

Petitioner's Exhibit 1.

had prepared it before she came, so that doesn't follow.

The other thing is that—and [Appellant] says that Mary Reilly prepared the second page.

Another point on the whole—I'm going to deal with the whole 12/15/2005 incident together. I'm not breaking it down witness by witness. We have to look at the whole picture.

There has been this discussion about the handwritten document from 2002, and that's been mentioned throughout. And I questioned, Where is that document? And it was stated that, suggested, I guess, that [Appellant] had that document or still has that document. Why hasn't that been produced if the December 15, 2005 document, simply a typed-written document from 2002, [...] what was the reason for typing it? This suggests that there is no handwritten one for 2002 or there is one from 2002 that says something different and perhaps does contain the original signature of Marjorie Cruciani, and it looks a lot different from the one that's on the 2005 document. I don't know. That's all speculation. But the point is, there's been a lot of mention about this handwritten one, and it hasn't been produced and there doesn't appear to be any good reason for that, and it would be highly suspect if it's produced later after this proceeding.

The other thing we note, with regard to Mary Ann Reilly, she had no ledger. She agreed with me that [...] a notary, one of the key obligations is to keep a ledger. She didn't do that. She didn't even keep a temporary one since she had lost her other one. She was not careful in her preparation of these documents, of the second page, because she wrote it saying that she was acknowledging the signatures of Marjorie Cruciani and [Appellant], when [Appellant] didn't sign anything. So she wasn't careful there. She was either giving legal advice or coming close to it, which suggests that she is not doing things that are appropriate for her to do. She was not organized. She conferred with [Appellant] or [Appellant] conferred with her regarding her testimony. And that was spelled out by her and [Appellant]; just the other night they conferred. [Appellant] even said, I straightened her out on a few things, so I think it would be interesting to have heard Mary Ann's testimony without having the benefit of conferring with [Appellant]. This suggests, among other things, that Mary Ann is more than just a neutral witness, but there is a relationship there [...].

With regard to Mary Ann, she seems too interested in the case and the outcome [...].

As well as Sherry Bauer seems too interested in the case [...], not that that alone tells me something, but it adds to the fact that their testimony is not credible to me.

Also, [...] the December 15, 2005 document was so important to [Appellant ...] then why did she have so much trouble finding it [...]? Why didn't she keep it in a safe place with her important papers or somewhere if it was that important to her? [...].

I'm doubtful as to whether there was a meeting on the 15th. I'm doubtful that if there was a meeting, whether there was any signing of any documents. [...] It seems very odd and I find it hard to believe that someone would keep their laptop in their car and keep printing paper in [Appellant's] car [...]. Now, [Appellant] didn't have a printer in her car, so why she has the paper, I don't know [...]. It seems odd to carry

around paper without a printer. If she goes to Staples, what's the point of having your own paper? Why not use their paper? That seems odd, too convenient, and suggested that if she did that [. . .] it was one more thing in her control and manipulation of the situation [. . .].

\*  \*  \*  \*  \*  \*

It's possible that [Appellant] got together with these witnesses and they simply decided to lie about this. It's possible that the witnesses weren't really there when it was signed and she herself, [Appellant], signed it and then told them that she signed it. [. . . B]ut it doesn't seem, the evidence is not showing that it was Marjorie [Cruciani] who signed it.

\*  \*  \*  \*  \*  \*

Another point is that she never produced the document until late in the game, in terms of late in the administration of the Estate. When she went to Attorney Conrad's office, she did not produce it. She didn't even mention it. And if you're not going to do it then, when are you going to do it? If she really thought this was a will, or an estate document, or something that dealt with a person dealing with their property after their death, why would she not mention it? At least mention it. If she said, "I don't know where it is. I have it," why would she not have mentioned it? Why didn't she tell anyone about this? She goes to the meeting with the lawyer, and the family, and the whole purpose of this is to discuss wills and she never mentions it. Does it make sense that she would forget, if it's so important? And then, even after she started to mention it, she didn't show it to anybody. She never came forward with it. She didn't come forward with this other one from 2002. She never came forward, even after being asked

about it. And to say that she couldn't find it also affects her credib[ility], if this is such an important document.

She told us she gave Mary Ann a copy of it. Well, Mary Ann told us that she did not get a copy of it. So in their conferring, they neglected to get together on that one.

The other thing is, if Mary Ann did have a copy, why didn't [Appellant] call her when she couldn't find it and say, "Hey, do you have that copy of that document we did?" But, she didn't do that.

\*  \*  \*  \*  \*  \*

It's hard for [Appellant] to be around here in Lehigh County geographically because it's close to where her mother lived. Well, that seems to fly in the face that she wants to be able to live here the rest of her life. So that doesn't seem to follow [. . .].

And, based upon these findings, I find that the signature [of Marjorie Cruciani on the December 15, 2005, document] is a forgery [. . .].

N.T., 10/2/08, at 59–71. Our review of the trial transcript is supportive of the Orphans' Court findings of fact and conclusions of law invalidating the decedent's signature on the December 15, 2005, document as a forgery.

> [A fact finder] is the only appropriate tribunal, in such a case [where forgery of a will is asserted], to determine which way the balance inclines. Having the testimony present[ed] to [its] eyes as well as [its] ears, the truth may be made manifest beyond any substantial doubt [. . .].

*DeLaurentiis' Estate*, 323 Pa. 70, 80, 186 A. 359, 363–64 (1936).

¶ 11 Herein, the Orphans' Court was positioned uniquely as the finder-of-fact

and credibility-assessor to weigh the testimony elicited by the litigants in support of their respective positions. Thus, we conclude that the findings of fact by the Orphans' Court are supported by the record, as well as agreeing that clear and convincing evidence was presented to prove that the document purported to be the decedent's will was a forgery. *See In re: Estate of Presutti, supra.* Accordingly, we affirm the order of the Orphans' Court.

¶ 12 Order affirmed.