J-A20003-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN RE: ESTATE OF CARLOS IGNACIO SANCHEZ, DECEASED | : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: ALICIA SANCHEZ | : : : : : : : | |
| | : | No. 66 EDA 2025 |

Appeal from the Order Entered October 29, 2024
In the Court of Common Pleas of Northampton County Orphans' Court at
No(s):  C-48-OC-2023-0445

BEFORE:   MURRAY, J., McLAUGHLIN, J., and FORD ELLIOTT, P.J.E.*

MEMORANDUM BY MURRAY, J.:                **FILED SEPTEMBER 12, 2025**

Alicia Sanchez (Appellant), the daughter of Ignacio Sanchez (Decedent), appeals from the orphans' court's order granting the petition (petition) filed by Decedent's widow, Anga Abouelsaad (Ms. Abouelsaad), which sought to appeal the grant of probate, declare that Decedent died intestate, and appoint Ms. Abouelsaad as administratrix of Decedent's estate.  The orphans' court's order further granted Ms. Abouelsaad a spousal share of the Decedent's estate, and granted Decedent's surviving children from prior relationships, Appellant, Flora Pagan (Flora), Frances Sanchez (Frances), and Annelis Sanchez (Annelis), equal one-eighth shares of Decedent's estate.  Finally, the orphans' court's order revoked the existing letters testamentary issued to

_____

* Retired Senior Judge assigned to the Superior Court.

Appellant, and issued letters of administration to Ms. Abouelsaad. After careful review, we affirm the orphans' court's order.

The orphans' court's findings of fact provide the history underlying the instant appeal. Decedent was born in April 1955 and died on November 10, 2022. Findings of Fact and Conclusions of Law (FFCL), 10/29/24, ¶ 10. Decedent married Ms. Abouelsaad on May 9, 2014. *Id.* ¶ 16. Decedent is survived by his four children from prior relationships. *Id.* ¶ 17.

Until his death, Decedent resided at property located at 230 Vista Drive, Easton, Pennsylvania (the property). *Id.* ¶ 1. As found by the orphans' court,

> Decedent was the sole owner of the property. [Ms.] Abouelsaad has resided at the property since May 2017. … [Ms.] Abouelsaad was living at the property with Decedent at the time of his death.
>
> On May 17, 2019, Decedent filed a complaint for divorce against [Ms.] Abouelsaad. No divorce decree was issued. … [Previously, on] May 7, 2019, [Ms.] Abouelsaad filed a petition for Emergency Protection from Abuse (PFA) against Decedent for pointing a gun at [Ms.] Abouelsaad. The PFA [proceeding] was dismissed on November 22, 2019[,] when [Ms.] Abouelsaad did not appear for the final hearing. N.T.[, 4/8/24], at 53; *see* Order to Dismiss, ***Abouelsaad v. Sanchez***, C-48-PF-2019-636 (C.P. Northampton Co. Nov. 22, 2019).
>
> The Commonwealth filed criminal charges against Decedent for the incident relating to [Ms.] Abouelsaad's PFA petition.
>
> [Ms.] Abouelsaad testified that the only time Decedent was not residing at the property was during the pendency of the PFA in 2019. During that time, Decedent lived in New York.
>
> ….
>
> On September 7, 2021, Appellant filed a petition for guardianship of Decedent with the Orphans' Court. [No action was taken on the petition.]

- 2 -

On July 20, 2022, [Ms. Abouelsaad's daughter from a prior relationship] filed a … PFA [petition] against Decedent. The PFA was dismissed on August 3, 2022[,] when [Ms. Abouelsaad's daughter] did not appear for the final hearing.

*Id.* ¶¶ 20-27, 29-32 (paragraph numbers and most citations omitted; paragraph formatting modified).

In addition, "Decedent also had a partner, Myriam Cruz ([Ms.] Cruz). [Ms.] Abouelsaad did not know [Ms.] Cruz was Decedent's partner until after [his] death." *Id.* ¶¶ 18-19.

Following Decedent's death, on February 13, 2023, Appellant filed an ejectment action to remove Ms. Abouelsaad and her adult daughter from the property. *Id.* ¶ 1. About a month later, on March 16, 2023, Appellant submitted a will, purportedly executed by Decedent, for probate. The will named Appellant as executor and Decedent's sole heir. *Id.* ¶ 4. The Northampton County Register of Wills issued an order admitting the will to probate and granting letters testamentary to Appellant. *Id.* ¶ 3.

On March 20, 2023, Ms. Abouelsaad filed a counterclaim in the ejectment action, alleging that the deed purportedly transferring the property to Appellant is a forgery. *Id.* ¶ 5. On September 1, 2023, Ms. Abouelsaad filed the instant petition. *Id.* ¶ 6. Ms. Abouelsaad alleged that the will presented by Appellant is a forgery, and additionally requested counsel fees. *Id.* ¶¶ 7-8.

On April 8-9, 2024, the orphans' court conducted a non-jury trial on the ejectment action simultaneously with its hearing on the petition. On October 29, 2024, the orphans' court entered its FFCL and its order granting the petition. Orphans' Court Order, 10/29/24, at 1. The orphans' court concluded that Ms. Abouelsaad met her burden and proved that the will submitted by Appellant was a forgery. Orphans' Court's Conclusions of Law, 10/29/24, ¶ 2. The orphans' court revoked the letters testamentary issued to Appellant, and ruled that Ms. Abouelsaad is entitled to letters of administration.[1] Orphans' Court Order, 10/29/24, at 1.

The orphans' court further declared that Decedent died intestate, and directed that Ms. Abouelsaad is entitled to her spousal share of one-half of Decedent's estate. *Id.* The orphans' court ordered that Decedent's surviving children are each entitled to one-eighth shares of Decedent's estate. Finally, the orphans' court denied Ms. Abouelsaad's request for counsel fees. This timely appeal followed. Appellant and the orphans' court have complied with Pa.R.A.P. 1925.

Appellant presents the following issue for our review:

Did the [orphans'] court err and abuse its discretion in granting the petition of [Ms.] Abouelsaad to declare the estate intestate on the grounds that the will presented for probate by [D]ecedent's daughter, [Appellant], was forged?

_____

[1] It is unclear how the orphans' court resolved the ejectment action. However, no party contests this issue.

- 4 -

Appellant's Brief at 2.

An "[o]rphans' court decision will not be reversed unless there has been an abuse of discretion or a fundamental error in applying the correct principles of law." ***In re Estate of Whitley***, 50 A.3d 203, 206-07 (Pa. Super. 2012) (quoting ***In re Estate of Luongo***, 823 A.2d 942, 951 (Pa. Super. 2003)).

> Because the [o]rphans' [c]ourt sits as the fact-finder, it determines the credibility of the witnesses, and on review, we will not reverse its credibility determinations absent an abuse of discretion.

***In re Estate of Cruciani***, 986 A.2d 853, 855 (Pa. Super. 2009) (citation omitted). "An abuse of discretion occurs when the court misapplies existing law, makes a manifestly unreasonable judgment, or rules with partiality, prejudice or ill will." ***In re Estate of Tomcik***, 286 A.3d 748, 764 (Pa. Super. 2022) (citation omitted).

Appellant argues that Ms. Abouelsaad failed to prove, by clear and convincing evidence, that the will was a forged document. Appellant's Brief at 13. Appellant argues that the expert opinion evidence offered at trial by Ms. Abouelsaad's handwriting expert, which we detail *infra*, "cannot outweigh the positive evidence of actual facts presented by credible witnesses." ***Id.*** at 14. According to Appellant, "expert evidence regarding a forged signature cannot override direct, credible evidence concerning the signing of the document." ***Id.***

Appellant asserts that the record evidence "does not adequately support" the orphans' court's factual findings. ***Id.*** at 15. Appellant argues

that the orphans' court improperly relied on the will signature's missing middle initial, claiming that the omission is a small distinction and "too insignificant." *Id.* Appellant also disputes the orphans' court's determination that "it was unlikely [D]ecedent would leave his entire inheritance to [Appellant], disinheriting his other three daughters and [Ms.] Abouelsaad." *Id.* Appellant directs our attention to evidence that Appellant was raised by Decedent and lived with him during her childhood. *Id.* Further, Appellant asserts that Decedent stayed with her "during periods of marital relationship strife to avoid conflicts." *Id.* Appellant cites evidence that she paid Decedent's bail following his arrest, and allowed Decedent to live with her for 6-8 months. *Id.* In addition, Appellant claims Decedent stayed with her "for about one weekend each month or every other month." *Id.* at 16. According to Appellant, in the months preceding his death, Decedent divided his time between the property and Ms. Cruz's home. *Id.*

Appellant asserts that in the years prior to his death, Decedent struggled to remove Ms. Abouelsaad and her daughter from the property, and was "navigating a difficult divorce." *Id.* at 18. Appellant points out evidence that Decedent filed a divorce complaint against Ms. Abouelsaad. *Id.* at 19.

Appellant also disputes the orphans' court's decision to credit the testimony of Flora, Decedent's daughter, regarding Decedent's signature. *Id.* According to Appellant, Flora "did not examine any of the alleged letters or postcards she received from [D]ecedent before coming to court or during the

- 6 -

litigation." ***Id.*** Appellant argues that Flora "was not an independent or unbiased witness, as she had little to no relationship with [Decedent] or … [Appellant]." ***Id.*** at 21. Further, Appellant claims Flora did not visit Decedent during the last five years of Decedent's life. ***Id.***

Appellant also challenges the orphans' court's decision to credit the testimony of Ms. Abouelsaad's expert, Donald Frangipani (Mr. Frangipani), over the testimony of Appellant's expert, Sandy Stevens (Ms. Stevens). ***Id.*** Appellant directs our attention to Mr. Frangipani's testimony that the online auction platform eBay removed him from the site, due to his mistaken authentication of celebrity signatures. ***Id.*** at 22-23. Appellant further disputes Mr. Frangipani's expert testimony that the signature on the probated will is not Decedent's signature. ***Id.*** at 25. Appellant argues that the orphans' court

> also disregarded that under Pennsylvania law set forth in ***In re*** [***In re Cline's Estate***], … 252 A.2d 657 ([Pa.] 1969), the opinion evidence of experts in cases of forgery is of little weight and cannot prevail against positive evidence of actual facts by witnesses whom the [court] considers credible. ***In re Elias'*** [***Estate***], … 239 A.2d 393, 396 ([Pa.] 1968); ***In re Pochron's*** [***Estate***], … 80 A.2d 794 ([Pa.] 1951)….

***Id.*** at 26.

Appellant claims "the substantial credible evidence undermined the clear and convincing evidentiary burden that Ms. Abouelsaad needed to meet to succeed in her forgery claim, which included more than just [Appellant's] testimony." ***Id.*** at 27. In support, Appellant directs our attention to the

testimony of Decedent's brother, Edwin Sanchez (Mr. Sanchez), "that he, [Ms.] Cruz, and [D]ecedent signed the will in [Decedent's] vehicle, with the notary on speakerphone during the signing." *Id.*

Appellant also relies on her own testimony that Decedent had "frequently mentioned to her that he had" a will. *Id.* at 29. Appellant relies on her own testimony that she is familiar with Decedent's signature and that the signatures on the probated will are those of Decedent. *Id.* at 30.

Appellant compares the evidence in this case with the clear and convincing evidence presented in *Cline's Estate*, wherein testimony from the contestant, the vice president of the decedent's bank, the decedent's attorney, and a qualified handwriting expert, were presented, each of whom concluded the will was a forgery. *Id.* at 33-34.

"Ordinarily, forgery is the unauthorized signing of a testator's will by another[.]" *In re Luongo*, 823 A.2d at 967. "A claim of forgery presents an issue of fact; as such, the resolution of the issue necessarily turns *on the court's assessment of the witnesses' credibility*." *In re Estate of Grigg*, 324 A.3d 40, 45 (Pa. Super. 2024) (emphasis added). "Because the orphans' court sits as the factfinder, it determines the credibility of the witnesses, and on review, we will not reverse its credibility determinations absent an abuse of discretion." *Id.* Similarly, "[a] trial judge passing upon issues dependent [on] expert opinion testimony is free to accept one expert witness's opinion over that of a conflicting opinion so long as there is adequate record support."

*Commonwealth v. Flor*, 259 A.3d 891, 911 (Pa. 2021) (quoting

*Commonwealth v. Banks*, 29 A.3d 1129, 1135 (Pa. 2011)).

> Our courts have long recognized that even uncontradicted testimony need not be accepted as true. *Aaron v. Strausser*, … 59 A.2d 910, 912 (Pa. 1948) ("Evidence which is uncontradicted is not necessarily to be accepted as true. Although direct evidence contradicting the testimony of witnesses may be lacking, the [factfinder is] not bound to accept it as true where it contains inherent improbabilities which, alone or in connection with other circumstances in evidence, furnish a reasonable ground for concluding that the testimony is not true."); *Elza v. Chovan*, … 144 A.2d 436, 438 (Pa. Super. 1958), *affirmed*, … 152 A.2d 238 (Pa. 1959) (The trier of fact "is not required to believe everything that a litigant or his witnesses say, even though their testimony is uncontradicted.").

*Grigg*, 324 A.3d at 46-47.

In order to establish a claim that a will is a forgery, the complainant must prove the existence of the forged document by clear, direct, precise, and convincing evidence. *Cruciani*, 986 A.2d at 855. When reviewing a determination concerning the validity of a purportedly forged will, the Pennsylvania Supreme Court directed that

> (a) the findings of fact by the chancellor, approved by a court *en banc*, have the weight and effect of a jury verdict and must be accepted at the appellate level unless such findings lack evidentiary support or unless the chancellor has capriciously disbelieved evidence or abused his discretion or committed an error of law;
>
> (b) one who relies upon forgery to challenge the validity of a will has the burden of proving such forgery in a clear, direct, precise and convincing manner;
>
> (c) the opinion evidence of experts in cases of forgery is of little weight and cannot prevail against positive evidence of actual facts by witnesses whom the Chancellor considers credible; [and]

- 9 -

(d) the testimony of handwriting experts that a will offered for probate is a forgery[,] corroborated by probative facts and circumstances[,] may be sufficient to overcome the testimony of those claiming to be subscribing witnesses to the questioned document and to support a finding of forgery and the corroborative evidence may be the most nearly positive and direct evidence which the nature of the case will admit.

*Cline's Estate*, 252 A.2d at 660 (citations and internal quotation marks omitted; format altered); *accord Grigg*, 324 A.3d at 45.

At trial, Flora testified that following the death of her father, Decedent, she conversed with Appellant about Ms. Abouelsaad. N.T., 4/8/23, at 138-39. According to Flora, Appellant's "first comment was that she was going to do whatever was in her power to leave [Ms. Abouelsaad] and her daughter in the street." *Id.* at 139. Flora confirmed that in her conversations with Appellant, Appellant acknowledged "there was no will." *Id.* at 139, 146. Flora testified that Appellant subsequently requested that Flora sign a renunciation of her interest in administering Decedent's estate. *Id.* at 141-42. Flora declined to sign the renunciation. *Id.* at 142.

On May 30, 2023, Flora filed a notice of intention to appeal from register. *Id.* at 144, 146. This notice provided, in relevant part, the following:

The undersigned, a party in interest, intends to file an appeal to the Orphans' Court division … from the following decision of the Register of Wills in the above estate. Granting letters of administration to [Appellant] …. And then the other … document filed by [Appellant] is not legal. [Appellant] is not acting on behalf of myself nor my sister, Annelis []. We are legal daughters of [Decedent]. [Decedent] didn't really have a testament. … [T]he document presented is false….

*Id.* at 145. Flora testified,

> I had a conversation with [Ms. Abouelsaad], and she had mentioned that there were [] documents filed [and] that there was a will, but I had previous conversations with [Appellant], and there was no will. She specifically mentioned to us that there was no will.

*Id.* at 147.

Regarding her familiarity with Decedent's signature, Flora testified,

> I live[d] with him in 2008, so I am familiar with his signature because he enroll[ed] my daughter in school. Since we lived in his household, he had to complete her paperwork for school.
>
> ….
>
> … I have seen [Decedent's] signature throughout my life. Not only when he did documents in 2008, but I do remember as a child I ask[ed] him, … why your [*sic*] signature is like scribble that you can't read, and he taught me that the reason he made his signature that way was because you're supposed to sign [so] that nobody can duplicate your signature ….

*Id.* at 148, 150. Flora confirmed that "I seen [*sic*] his signature all my life, and in 2008[,] it has not changed. It was the same." *Id.* at 150. Upon reviewing the signatures on the proposed will, Flora testified that the signatures were not those of Decedent. *Id.* at 148, 151. Flora further testified that Appellant never told her about the will, or about the deed transferring ownership of the property to Appellant. *Id.* at 152.

On cross-examination, Flora acknowledged that she did not visit the property in the five years prior to Decedent's death. *Id.* at 156. Flora further confirmed she did not review the 2008 documents in the last two years. *Id.* at 157. However, Flora confirmed that throughout her life, Decedent sent her

cards for graduation, Christmas and birthdays. *Id.* at 159. Regarding the signatures on the will, Flora explained that the "S" in Sanchez "was easy to read, whereas Decedent "used to scribble [so] that you could not really understand what he wrote." *Id.* at 163. She continued, "And the fact that … you could read it, it says Sanchez. He never wrote that way." *Id.*

Ms. Abouelsaad also testified at trial. Ms. Abouelsaad testified that prior to Decedent's death, she had no issues with Decedent's daughters. *Id.* at 50. However, after Decedent's death, Ms. Abouelsaad began to have problems with Appellant. *Id.*

Ms. Abouelsaad explained her relationship with Decedent. *Id.* at 51. At first, Ms. Abouelsaad stated, the couple did not have issues. *Id.* However, in 2019,

> [Decedent] was on drunk [*sic*] and drugs, and this was the problem. This was the argument between me and him. We were upstairs and then [Decedent] would argue about something, and I don't want to argue with him because at that time he was drinking, so I went downstairs to the garage to avoid him, and he followed me down, and he insist[ed] to [*sic*] arguing and then he push[ed] me out of the house and then my daughter opened the door for me.
>
> I spen[t] the whole night with my daughter in her rooms and … when I woke up and I get out of the room, [Decedent] keep[s] insist[ing] to argument [*sic*] [and he] get[s] crazy, starting to take all the drawers from the closet and throw me [*sic*] with it. He took the TV, knocking down to the floor and then he point[ed] the gun at my … face, at me….

*Id.* at 51-52. This incident took place on May 7, 2019. *Id.* at 52. Thereafter, Ms. Abouelsaad obtained a PFA order. *Id.* Subsequently, Ms. Abouelsaad told

Decedent she would not lie in court, but would refrain from appearing for the PFA hearing. *Id.* at 53. Although Decedent filed for divorce against Ms. Abouelsaad, nothing followed that filing. *Id.* at 69. Ms. Abouelsaad testified that in July 2021, her daughter obtained a PFA order against Decedent. *Id.* at 54.

Ms. Abouelsaad testified she had no knowledge of the will advanced by Appellant. *Id.* at 61. Ms. Abouelsaad testified that she is familiar with Decedent's signature, because Decedent "sign[ed] too many documents" in front of her. *Id.* at 66. Ms. Abouelsaad testified the signature on the will is not Decedent's signature. *Id.* at 67, 68.

Ms. Abouelsaad also presented the testimony of her handwriting expert, Mr. Frangipani. N.T., 4/9/23, at 169. Mr. Frangipani testified that the last time he testified as a handwriting expert was in 2018. *Id.* at 180. However, Mr. Frangipani was scheduled to testify as an expert the day after his trial testimony. *Id.* at 179.

Mr. Frangipani listed his certifications:

[The] American Board of Forensic Examiners. I've taken classes at John Jay College, Valencia College in Florida. I'm a member of the New York State Division[,] which qualifies me also as a questioned document examiner. I attend all of their meetings; New York, New Jersey and Connecticut. I'm also qualified Tri-State Legal Photographers. I attend their classes for forensic photography. Another organization out of Baltimore, and one of your associates is an organization in Manhattan, Felix Kline was one of my instructors.

*Id.* at 175. Mr. Frangipani explained that he has testified as a handwriting expert in New York and in New York State's federal courts. *Id.* at 177-78. Mr. Frangipani indicated that he has been qualified as a handwriting expert in New York, New Jersey, Puerto Rico and Kingston, Jamaica. *Id.* at 176. According to Mr. Frangipani, he has been accepted as an expert about "[s]eventy, eighty times maybe." *Id.* Mr. Frangipani stated he has lectured on the subject of handwriting analysis at John Jay College and for "various organizations." *Id.* at 178.

Mr. Frangipani testified about

one of the biggest cases I worked on, I was appointed by the federal court, Judge Duffy of New York, on the World Trade center bombing. I worked … against a terrorist. My job was to take handwriting specimens from the terrorist. So I spent 19 hours over three months with the terrorist. Then I would go to the FBI lab and examine all of the evidence. That was part of the bombing training.

*Id.* at 176.

Mr. Frangipani explained an incident involving his removal from eBay as a signature authenticator:

I was on eBay, and eBay removed me, and the reason they removed me is because other people out there who claim to be experts that never qualified, yet they're accepted. … [T]he FBI came to my office, … and they brought with them 350 letters that I allegedly examined….

The FBI agent showed me each letter, He says, are these yours? I said no, these are not my signatures. … They went over each one. I got a call from the FBI two days later. They said you're our witness. … I was supposed to testify against an outfit in Las Vegas called Smokey's. All [of] these organizations were taking my letters and making copies. I have a record of all that.

The agent calls me up and he says to me, we don't need you to testify, we shut down Smokey's and we proved that these letters were all copied. So everybody that knew I was in this business started posting all of this stuff about me on eBay.

….

When the FBI came to my office with all of those letters, … the FBI agreed that I was correct. First of all, I have to name a few people. It was Tiger Woods, Mark Maguire. These are people that said they never signed any of these things. ….

I brought a video to the court to show Tiger Woods signing PGA flags and everything else, so I wasn't proven wrong. Then I testified in federal court in a commission trial, … and I was accepted after that, also.

*Id.* at 184-86. Mr. Frangipani acknowledged that the television network HBO had aired a documentary about this case. *Id.* at 187. Mr. Frangipani testified that he sued HBO over their statement that Mr. Frangipani was "the forger's authenticator of choice" based upon the eBay matter. *Id.* at 188. That lawsuit was ultimately dismissed. *Id.*

Mr. Frangipani further explained a statement he made in an interview:

Q. [Appellant's counsel]: You were asked during the interview with Sports Digest whether you mistakenly authenticated signatures, correct?

A. [Mr. Frangipani]: The statement I made is we all make mistakes.

Q. Well, actually your statement was I've been wrong many, many, many times. Isn't that what you told them?

A. I say that. I may have been wrong many times. First of all, handwriting is an opinionated science. Another case is with the New York Yankees where I verified a lot of signatures on the

- 15 -

players.  I proved later [] that the clubhouse manager was the one signing their names.

*Id.* at 187.  The orphans' court qualified Mr. Frangipani as an expert.  *Id.* at 189.

Mr. Frangipani testified regarding his analysis of Decedent's signature on the will submitted by Appellant.  Mr. Frangipani confirmed that he examined the original will filed at the courthouse.  *Id.* at 190.  Mr. Frangipani further confirmed he examined known signatures of Decedent and issued two reports.  *Id.*  Mr. Frangipani testified that

the first report that I issued, I put in that report suspicious.  The reason I used the word suspicious is because the will on that page was not notarized, not signed, and it was blank, the day was blank.  That's why I was suspicious.  Then I went back over again and I issued a second report.

*Id.* at 190-91.  Mr. Frangipani testified his opinion did change, and confirmed his "opinion was to a reasonable degree of certainty that [Decedent] did not sign that particular signature."  *Id.* at 191.  Mr. Frangipani explained that,

first of all, under the microscope I look at each letter, the degree of slant, spacing, height of letters, baseline writing, pen pressure. I looked at all of those things when I look[ed] at the signature.

*Id.* at 192.

In concluding that the signature on the will was not Decedent's signature, Mr. Frangipani stated that, "if you look at the two questioned signatures, there's no middle initial ….  On the known signatures, it's consistent on every signature."  *Id.* at 195.  Mr. Frangipani further explained that "the terminal strokes on the Z are not consistent with each other.  Every

one has a different space …. If you look at all the Ss and the Cs[,] … all the Ss [are] wide open. … Every one." *Id.* at 196. Mr. Frangipani differentiated the way the known signatures of Decedent formed the letter "s" from the letter "s" used in the proposed will. *Id.* at 198-99. Regarding the letter "z", Mr. Frangipani testified that the "terminal strokes" in the known signatures are open, while the terminal strokes are closed in the will's signature. *Id.* at 201. Mr. Frangipani further distinguished other letters in the known signature exemplars from those in the proposed will. *Id.* at 202-03. Mr. Frangipani opined, "After a normal study during a microscopic exam, it is my professional opinion [Decedent] did not sign the two signatures on the will." *Id.* at 204.

In support of the will's authenticity, Appellant presented the testimony of Mr. Sanchez. *Id.* at 236. Mr. Sanchez testified that Decedent had been in a romantic relationship with Ms. Cruz for about 35 years. *Id.* at 237. According to Mr. Sanchez, Ms. Cruz and Decedent are the parents of Frances. *Id.* However, Decedent and Ms. Cruz never married. *Id.* at 238. Mr. Sanchez testified that Decedent and Ms. Cruz maintained their relationship until Decedent's death. *Id.* at 238. Mr. Sanchez described Decedent as "a womanizer. He loved women. That was his weakness." *Id.* at 239.

Regarding the will, Mr. Sanchez testified that

[Decedent] kept in contact with me on a daily basis and told me we were going to meet up and that he needed me to be a witness to a will that he was going to sign for his own reasons. … [Decedent] wanted me to be a witness, and I have been a witness to other transactions that he has made with [the notary, Theresa Baerga (Theresa),] because he buys cars, he sells cars, so she

- 17 -

was no stranger to the family. [Appellant has known] her for over 30 years. I personally don't have that close relationship, but I am knowledgeable of who the lady is, and in the past I have been there with [Decedent] to do other witnessing when he was selling a vehicle or a motorcycle or so on.

…

… We were initially supposed to meet in Theresa's house, but I was not going to go meet up with [Decedent] …. I was working, and I told [Decedent] I couldn't make it, and we did it remotely from his car, which we met before in different locations when I need to see him. It was midway from where he lives and where I live, so in this particular instance we met in his car, and he did it off his remote.

*Id.* at 252-53, 256. According to Mr. Sanchez, Ms. Cruz and Appellant met with Mr. Sanchez at a service station. *Id.* at 265-66. Mr. Sanchez entered Appellant's vehicle. *Id.* at 266. Appellant called Theresa on by phone, but without video. *Id.* at 266-67. Appellant signed the document, after which Mr. Sanchez and Ms. Cruz signed as witnesses. *Id.* at 267. Mr. Sanchez testified that he did not read the document presented for his signature. *Id.* at 271. Mr. Sanchez testified that the signature on the will is consistent with Decedent's signature, which he has seen on other occasions. *Id.* at 273.

Mr. Sanchez testified that Appellant and Decedent were close:

[Appellant] was … his right hand. [Decedent] moved to Pennsylvania to be near [Appellant] because she was his support, his advisor. They did everything together, so he wanted to live near her and provide for her. [Decedent] … was always staying at [Appellant's] house. He lived at her house. When he couldn't go back to the house that he bought, he stood in [Appellant's] house. He stayed there.

- 18 -

*Id.* at 274. According to Mr. Sanchez, Appellant "was his favorite daughter."
*Id.*

Appellant also presented the testimony of Steven Mills, Esquire (Attorney Mills). Attorney Mills testified that he represented Decedent in the PFA action filed against Decedent by Ms. Abouelsaad. N.T., 4/9/24, at 5. However, the PFA action was dismissed because Ms. Abouelsaad failed to appear for the hearing. *Id.* at 11. Attorney Mills also confirmed that he had prepared a divorce complaint for Decedent. *Id.* at 6. Regarding the PFA matter filed by Ms. Abouelsaad's daughter, Attorney Mills testified that the matter was dismissed based upon the failure of Ms. Abouelsaad's daughter to appear for the final hearing. *Id.* at 26.

Appellant next presented the expert testimony of Ms. Stevens. *Id.* at 41. Ms. Stevens testified that she is a certified document examiner. *Id.* Ms. Stevens explained her certification as follows:

> When the president of the National Bureau of Document Examiners went over my court cases, I had been going to court for 12 years before I was certified, so he went over not only my court cases but my methodology and my publications. My publication[s] are a series of forms that I use to show that I have a method of carefully examining documents, and the list is on my resume, a list of my publications, and I give them away for free to other document examiners.

*Id.* Ms. Stevens explained that she has been testifying as an expert in Pennsylvania since 1991. *Id.* at 43. Further, Ms. Stevens indicated that she has never been disqualified as an expert witness. *Id.* Ms. Stevens testified that she has taught courses for security professionals at Jersey City State

College for three semesters, and taught document examination for tellers at a credit union. *Id.* at 45. The orphans' court accepted Ms. Stevens' qualifications as an expert witness. *Id.* at 49.

Ms. Stevens described her examination of the signatures on the will and deed:

> [W]hat I did was I created trait similarity charts where I examined every single trait, every single stroke, on both signatures, compared to not only my six standards, but I also … scanned all the documents. Also [Mr.] Frangipani's … documents, which were 15 signatures, [] then I made a very clear list of those … as well as my 6 … so it came to 21 signatures.
>
> ….
>
> I carefully compared every single stroke, every single letter, to 21 Carlos Sanchez [known signatures (standards)] that were excellent because they were either notarized or witnessed. They were very good standards, and they were also clear, and they were rather timely….

*Id.* at 52-53 (punctuation modified). Ms. Stevens compared her standards with those analyzed by Mr. Frangipani:

> [Mr. Frangipani's standards] were from 2017, and mine were from a year and [] two months before [Decedent] died, so my standards were more timely than [Mr. Frangipani's] standards, but he had some excellent standards. I can't complain about his standards as far as the fact that they were notarized or witnessed, they were clear. What I did was I just made bigger copies, better copies, and straighter copies [of the signatures.]

*Id.* at 56.

Ms. Stevens described her process for analyzing Decedent's signatures:

> The first thing I do is I take all the documents and I scan them for clarity … and then I have a very large monitor so I'm looking at

the signatures that are very large now, clear and large. And what I do [i]s I make examples of the individual signatures.

I show them as being very large and very clear, and I don't just take a magnifying glass and go back and forth a few times. I do have a 40[-]power magnifying glass. But I go letter by letter, and what I do first is, I do … a trait similarity chart and the handwriting signature comparison chart so I understand fully every stroke of the signatures.

The standards, I'm going down a list to totally understand … how [Decedent] wrote, and he had a tremendous amount of variety to his signatures ….

*Id.* at 57-58.

Ms. Stevens testified regarding her comparisons of the signatures, letter

by letter:

What I found was the C began at the baseline in standards 3, 5, and 6. The C's upper loop is wide in standards 1, 2, 4, and 6. The C's overloop is slanted so rightward that it overhangs part of the L in standards 1, 2, 4, 5 and 6. Overhang part of the L in Carlos. And the C ends with the horizontal stroke in four standards and the C's ending stroke is tapered.

Now tapering is extremely important. Tapering at the beginning and the end of a name indicates authenticity because it's extremely hard to forge something so quickly that it has a taper, so I point to the tapers in these standards. So … five out of the six have the tapers. And I think that's very important, and it's on my forgery checklist.

….

… The A is separate from the C in five of the standards. … [A]ll of the standard As are higher above the baseline, and the A is more flattened and round in standards 2, 3, 4, and 5. All of these things are important because if somebody is doing a forgery, they can't keep track of … 30 things in a signature that … that are seen in the standards, especially on an upward slant.

…

- 21 -

> The next page is number 3, which is the R is missing, and I say five standards have no R. The R is seen only in standard 4. Now that is very important … that when this man is writing his name, he doesn't consciously say, I'm going to leave out the R in five of my standards. … [H]e's writing very quickly, and he's not figuring out what letters to leave out.
>
> Well, a forger would not forge something with all these different traits. … [I]t would be absolutely impossible, and this proves to authenticity. These are real reasons why I'm showing authenticity….

*Id.* at 63-64. Ms. Stevens similarly analyzed each letter in Decedent's signature. *See id.* at 64-73.

> However, with regard to the "S" in Carlos, Ms. Stevens testified,
>
> I made a mistake on that with the S on there where I put a line for the S, but now I realize it couldn't have been an S because it opens on the right, and all the Ss are closed and go towards the left, exactly the opposite, which is very clearly seen….

*Id.* at 73. Ms. Stevens further explained her examination of every letter in the Decedent's last name. *Id.* at 75-86.

Regarding the missing middle initial in the will's signature, Ms. Stevens testified she did not find it significant. *Id.* at 87. Ms. Stevens pointed out that five out of the 21 known standards had a missing middle initial. *Id.* Ms. Stevens opined that "in this case, leaving out the middle initial 5 out of 20 [*sic*] [times], that's a high number of showing that it wasn't a rarity." *Id.* at 88. Ms. Stevens opined that the signatures on the will are authentic signatures. *Id.* at 107.

On cross-examination, Ms. Stevens confirmed that timeliness of her standards "was very important" to her. *Id.* at 111. However, Ms. Stevens acknowledged that one of her standards is dated December 21, 2016. *Id.* Ms. Stevens further confirmed that she did not review the standards contained in Decedent's divorce complaint or his post-sentencing colloquy. *Id.* at 113-14. Ms. Stevens indicated she was unaware of those documents. *Id.* at 115.

At the hearing, Appellant testified that "throughout my entire life I was raised with [Decedent]." *Id.* at 166. According to Appellant,

> once I became an adult, and I was on my own because [Decedent] had various relationships, if there was ever an issue with any of those relationships, I basically was where he would go and stay. So he would go stay over [at] my house or he would call me and basically vice versa.

*Id.* at 167. This continued during the last five years of Decedent's life. *Id.*

> Appellant testified that
>
> [w]hen [Decedent] was arrested on criminal charges, he called me. I had to pay $2,000 to bail him out, and when I bailed him out he wasn't allowed to go home, so he had to stay with me during … six- to eight-month period that he stayed with me because he was not allowed in. During that time, I had to call [Ms. Abouelsaad] for medication. I had to call her for clothing or anything that needed to be brought because [Decedent] was not allowed to go into the home.

*Id.* at 168.

Appellant testified that there were other instances when Decedent would stay three or four days at her residence. *Id.* at 171. According to Appellant, from 2020-2022, Decedent would "stay probably for the weekend… on a monthly basis or every other month …." *Id.* Decedent additionally would

"pop in two to three times a week, have a cup of coffee and leave, even if it was … a five-minute drop-in to see what I was doing and stuff like that." *Id.* at 172. Appellant asserted that she and Decedent were "extremely" close. *Id.* Appellant also loaned Decedent money "when he needed it." *Id.* at 174.

Appellant testified to her understanding that Decedent had a will. *Id.* at 183. Appellant explained that months after Decedent's death, Ms. Cruz found the will at Decedent's Bronx, New York, residence. *Id.* at 176. According to Appellant, Decedent and Ms. Cruz had resided at that residence. *Id.* at 177.

Appellant testified that Decedent mentioned having a will numerous times. *Id.* at 185. However, Appellant stated she was unable to find the will. *Id.* Prior to Ms. Cruz finding the will, Ms. Abouelsaad sought PFA orders to preclude Frances and Appellant from removing items from the property. *Id.* at 187.

Appellant testified that she was familiar with Decedent's signature. *Id.* at 191. Appellant stated that she had reviewed Decedent's documents related to his purchase of the property and other work-related documents. *Id.* at 191. Appellant also saw Decedent's signature on "his lawyer's paperwork as well[,]" and on his bail certificate. *Id.* Appellant identified the signature on the will as Decedent's signature. *Id.* at 192.

Appellant acknowledged that in or around June 2023, she contacted Melissa Rudas, Esquire (Attorney Rudas), to prepare a will for Decedent. *Id.*

at 223. Appellant stated she asked Attorney Rudas to prepare a will that would name Appellant as executrix and devise Decedent's property in equal shares to his four daughters. *Id.* at 225.

Appellant also presented the testimony of Attorney Rudas. Attorney Rudas testified that a paralegal from her office prepared a will, a power of attorney, and a living will for Decedent. *Id.* at 234. However, Attorney Rudas never spoke with Decedent personally. *Id.* According to Attorney Rudas, her office communicated only with Appellant. *Id.* Attorney Rudas reviewed the will prepared by her paralegal. *Id.* at 235. The will named Appellant as executrix and divided Decedent's estate equally among his four daughters. *Id.* Attorney Rudas emailed a copy of the will to Appellant. *Id.* at 236. Attorney Rudas denied any knowledge of whether that will was executed by Decedent. *Id.* at 236. Attorney Rudas indicated that her office did not prepare the will presented by Appellant for probate. *Id.* at 242.

Easton Police Detective Thomas Klotz (Detective Klotz) testified regarding his investigation into the alleged forgery of the will and a deed. *Id.* at 278. According to Detective Klotz, he interviewed Appellant and Mr. Sanchez. *Id.* at 279. According to Detective Klotz, Mr. Sanchez stated his belief that he had signed Decedent's will in an office. *Id.* at 287. Detective Klotz also testified that he interviewed Appellant about the deed for the property:

> When I asked [Appellant] about the deed, I remember asking her questions about how the deed was worded on the part where if

[Decedent] was married or unmarried. I believe her response … was that … the attorney who prepared the deed was only copying it from the house that was previously sold, I guess when Decedent was single.

*Id.* at 288. Detective Klotz stated, "I believe [Appellant] asked the lawyer to create the deed[.]" *Id.* at 289.

Detective Klotz continued:

[Appellant] took the deed … into New York where she met, I believe, with [Decedent]. … [T]he deed was signed, I believe, in her house … in Phillipsburg, I believe is what she told me and then later took the deed with [Decedent's] driver's license to the notary in New York to have the deed signed and notarized.

*Id.* at 290. According to Detective Klotz,

when I spoke to the notary over the phone, she had mentioned that she's known [Appellant] for a very long time and that she knows the family so, therefore, she would be able to notarize the document without Decedent actually being there.

*Id.* at 291. Based upon his interview with Appellant, it was Detective Klotz's belief that the notary did not speak with Decedent that day. *Id.* Detective Klotz testified,

when I brought up the discrepancies between … what [Appellant] was telling me and what I had previously spoke to the notary about, [Appellant] said the notary was lying about how the document was signed.

*Id.*

Regarding the will, Detective Klotz testified that Appellant told him the will was created by Attorney Rudas, and it was only recently found in a closet. *Id.* at 292.

In its FFCL, the orphans' court credited the testimony of Ms. Abouelsaad, Flora, Mr. Frangipani, Detective Klotz, and Attorney Rudas. FFCL, 10/29/24, at 17. Regarding the testimony of Mr. Frangipani, the orphans' court stated,

> unlike [Ms.] Stevens[,] who examined a photocopy of the will, [Mr.] Frangipani examined the original will that was probated in the Orphans' Court. Second, [Mr.] Frangipani noted that the probated will was not signed by a notary public and the date on the will was blank. Third, [Mr.] Frangipani testified that there were different "strokes" on the letter "C" in Decedent's first name and the letter "z" of Decedent's last name. He found the "degree of slant" on the letter "I" in Decedent's first name to be different from the "I" in Decedent's known signatures. Finally, [Mr.] Frangipani found it notable that each of the known signatures except for one contained the middle initial "I," while the signatures on the probated will did not contain the middle initial "I." [Mr.] Frangipani concluded that the signatures on the will are not Decedent's signatures. [The orphans' court] found [Mr.] Frangipani's testimony to be reliable and credible.

*Id.* at 19.

Further, the orphans' court credited the testimony of Attorney Rudas:

> [B]ecause Attorney Rudas drafted a will naming Decedent's four children as equal heirs, and the probated will named [Appellant] as Decedent's sole heir, [the orphans' court] found that Attorney Rudas's testimony supported [Ms.] Abouelsaad's argument that the probated will was forged.

*Id.* at 22.

The orphans' court found the testimony of Appellant, Ms. Stevens, and Mr. Sanchez not to be credible. *Id.* Regarding Appellant's testimony, the orphans' court explained:

> First, [Appellant] testified that the will "was found in a closet in the Bronx" in the home where Decedent resided with [Ms.] Cruz, contradicting [Ms.] Abouelsaad's statement that Decedent resided with her until his death. Second, [Appellant] testified that

- 27 -

Decedent told her on numerous occasions that he had a will, yet [Flora] testified that [Appellant] advised her that Decedent did not have a will.

*Id.* at 23 (citations omitted). The orphans' court continued:

[Appellant] testified that she contacted Attorney Rudas to create a will … that would name [Appellant] as executor and Decedent's four daughters as equal heirs. Detective Klotz testified that "[Appellant] told me the will was created by Attorney Rudas. I guess the will had been lost, and she only recently found it in a closet somewhere. [The orphans' court] find[s] that there are inconsistencies in [Appellant's] statements to Detective Klotz and [Appellant's] testimony at trial. If the will was merely lost[,] as [Appellant] explained to Detective Klotz, when the will was found, [the court] believe[s] it would contain the same provisions as the will Attorney Rudas drafted, *i.e.*, naming Decedent's four children as equal heirs….

*Id.* at 23-24.

The orphans' court did not find Mr. Sanchez to be a credible witness, as Mr. Sanchez testified he signed the will in Decedent's car, but previously told Detective Klotz he had signed the will in an office in New York. *Id.* at 24-25. The orphans' court noted that Mr. Sanchez's recollection of the location he signed the will changed three times. *Id.* at 25.

Regarding Ms. Stevens's expert testimony, the orphans' court found that the mistakes in her testimony "are significant." *Id.* at 28. The orphans' court found Ms. Stevens incredible because

1) When making her report, she only examined six known signatures; 2) she did not examine the original probated will; 3) she admitted to making mistakes regarding her analysis of letter placement of Decedent's signature; 4) she did not find the middle initial "I" to be significant; and 5) Decedent's two signatures on the probated will were different from each other.

- 28 -

*Id.* at 29.

We conclude Appellant's reliance on *Cline's Estate* is misplaced. Instantly, the orphans' court did not solely rely upon the testimony of the handwriting expert, but on the testimony of Ms. Abouelsaad, Flora, Attorney Rudas, and Detective Klotz as well. Our review of the transcript is supportive of the orphans' court's findings and its conclusion invalidating Decedent's signatures on the will as a forgery.

> [A fact finder] is the only appropriate tribunal, in such a case [where forgery of a will is asserted], to determine which way the balance inclines. Having the testimony present[ed] to [its] eyes as well as [its] ears, the truth may be made manifest beyond any substantial doubt […].

*DeLaurentiis' Est.,* 186 A. 359, 363-64 (Pa. 1936). Instantly, the orphans' court was uniquely positioned as the finder-of-fact and credibility-assessor to weigh the testimony in support of the parties' respective positions. The orphans' court found clear and convincing evidence established that the will is a forgery, and the record supports the court's findings. Discerning no error or abuse of discretion, we affirm the orphans' court's order.

Order affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 9/12/2025